```
1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF DELAWARE
2

3
     TAKEDA PHARMACEUTICALS,)
4    U.S.A., INC.,          )
                            )
5           Plaintiff,      )   C.A. No. 19-2216-RGA
                            )
6    v.                     )
                            )
7    MYLAN PHARMACEUTICALS, )
     INC.,                   )
8                           )
            Defendant.      )
9

10                   Tuesday, January 21, 2020
                     10:18 a.m.
11                   Courtroom 6A

12                   844 King Street
                     Wilmington, Delaware
13

14

15   BEFORE:  THE HONORABLE RICHARD G. ANDREWS
             United States District Court Judge
16

17
     APPEARANCES:
18
             DRINKER, BIDDLE & REATH, LLP
19           BY:  FRANCIS DiGIOVANNI, ESQ.
             BY:  THATCHER A. RAHMEIER, ESQ.
20
                     -and-
21
             HAUG PARTNERS, LLP
22           BY:  PORTER F. FLEMING, ESQ.
             BY:  JONATHAN HERSTOFF, ESQ.
23           BY:  CAMILLE TURNER, ESQ.

24                   Counsel for the Plaintiff
```

```
 1    APPEARANCES CONTINUED:

 2

            MORRIS JAMES, LLP
 3          BY:  BRYAN TOWNSEND, ESQ.

 4                 -and-

 5    WILSON, SONSINI, GOODRICH & ROSATI
      BY:  MICHAEL SOMMER, ESQ.
 6    BY:  JESSICA MARGOLIS, ESQ.
      BY:  SHERYL SHAPIRO BASSIN, ESQ.
 7
                     Counsel for the Defendant
 8

 9     SHAW KELLER, LLP
       BY:  KAREN KELLER, ESQ.
10
                 -and-
11
      GOODWIN PROCTOR, LLP
12    BY:  SAMUEL SHERRY, ESQ.
      BY:  ELIZABETH HOLLAND, ESQ.
13    BY:  CHRISTINE LAROCHELLE, ESQ.

14                     Counsel for the Intervenor

15

16

17

18

19

20

21

22

23

24
```

```
 1                    THE COURT:  All right.  Please be
 2         seated, everyone.  Sorry for the delay.  All
 3         right.  So this is the motion to intervene and
 4         the primary injunction in Takeda versus Mylan,
 5         civil action number 19-2216.  So for plaintiff,
 6         Mr. DiGiovanni, how are you?
 7                    MR. DiGIOVANNI:  Very well, Your
 8         Honor.  Thank you.  So let me introduce my
 9         counsel.  Co-counsel.  For the record, Frank
10         DiGiovanni from Drinker, Biddle & Reath.
11         Thatcher Rahmeier, my associate, is here also.
12         From the Haug Partners LLP, Mr. Porter Fleming,
13         who is going to be making today's argument,
14         Jonathan Herstoff and Camille Turner.  And let
15         me introduce the Takeda representatives in-house
16         counsel, Mark Buonaiuto, as well as David
17         Banchil.  Thank you, Your Honor.
18                    THE COURT:  Okay.  Thank you.  So
19         for defendant.  Mr. Townsend.
20                    MR. TOWNSEND:  Good morning, Your
21         Honor.  Bryan Townsend from Morris James on
22         behalf of the defendant.  With me at counsel
23         table we have Michael Sommer, who will be making
24         the arguments today, as well as his colleagues
```

```
1     Jessica Margolis and Sheryl Shapiro Bassin.  We

2     also have behind the table we have Doug Miner

3     and Preston Pieratorra.

4                THE COURT:  Okay.  Thank you.  For

5     the proposed intervenor, Par Pharmaceuticals out

6     there.  Ms. Keller.

7                MS. KELLER:  Good morning, Your

8     Honor.  Karen Keller from Shaw Keller on behalf

9     of Par Pharmaceuticals.  With me today from

10    Goodwin Proctor are Elizabeth Holland, Sam

11    Sherry and Christine Larochelle.  And also from

12    Par Pharmaceuticals, Gina Jackarelli.

13               THE COURT:  All right.  What I

14    thought was we'd deal with the motion to

15    intervene first.  And so Ms. Holland, that's

16    you.

17               MS. HOLLAND:  Yes, Your Honor.

18    Actually, Mr. Sherry is going to argue the

19    motion to intervene.

20               THE COURT:  Okay.  Mr. Sherry.  I

21    should say I have read all the briefs, I think,

22    that have been submitted, including a couple

23    that are attached as exhibits to things.  I

24    hadn't unsealed them yet.  Also, I would say
```

1     there's no need to say anything here in court

2     that anybody is going to need to be asking me to

3     seal later on, so bear that in mind when you're

4     speaking.

5                     MR. SHERRY:  Indeed.  Thank you,

6     Your Honor.  So Par's motion to intervene should

7     be granted either as of right or permissively

8     under rule 24.  And I just want to note on the

9     top that while Takeda poses what I'll describe

10    as a lead objection regarding standing on the

11    patent claims, resolving that particular issue

12    isn't necessary to resolve Par's intervention

13    motion.

14                    THE COURT:  Well, I mean, you

15    don't really have much to stand on on that

16    issue, do you?  I mean, it seemed to me in your

17    reply brief you pretty much acknowledged that

18    you're not the kind of exclusive licensee that

19    the federal circuit has in mind when it says you

20    can bring patent claims on your own.

21                    MR. SHERRY:  Well, we think that

22    the collection of agreements, the settlement

23    agreement, the license agreement and the

24    distribution agreement are intended to create an

```
1    exclusive authorized generic and that the intent
2    and effect of that agreement is sufficient for
3    us to bring standing on the patent claims.  But
4    I certainly agree, Your Honor, that that is not
5    what we're resting on as the sole basis for the
6    intervention motion.
7                   THE COURT:  And do you also, in
8    your complaint in intervention had a complaint
9    for, think it was called intentional
10   interference with contract, right?
11                  MR. SHERRY:  With contractual
12   relations, that's correct.
13                  THE COURT:  So the case that you
14   cite in your brief somewhere for the proposition
15   that you actually can make that claim says you
16   have to say that somebody breached a contract
17   with you, but there's nothing in your complaint
18   that says anybody has breached the contract with
19   you, is there?
20                  MR. SHERRY:  Well, the case law
21   requires either a breach or a cancellation.  A
22   breach itself is not a requirement to bring an
23   intentional interference claim.
24                  THE COURT:  Okay.  And do you have
```

```
 1      a case citation for that?

 2                  MR. SHERRY:  I don't have a case

 3      for you at this exact moment, but I can provide

 4      one for that.

 5                  THE COURT:  Okay.  All right.

 6      Well, let's move along here.

 7                  MR. SHERRY:  In any event,

 8      intervention is warranted under Par's state law

 9      of claims of tortious interference with

10      contractual relations and unfair competition.

11      And I'll address 24(a) first.  I'll try to run

12      through the elements quickly, as I'm sure you're

13      aware of them.

14                  THE COURT:  Yeah, why don't you

15      concentrate on that your interest is not

16      adequately represented by an existing party in

17      the litigation.  And I base that on the interest

18      that you have in common is the interpretation of

19      the contract between Takeda and Mylan.

20                  MR. SHERRY:  Well, the interests

21      that are at stake are a little broader than

22      that.  So perhaps I'll address, with your

23      permission, Your Honor, briefly address those

24      and then turn to the representation issue.
```

```
 1                    THE COURT:  Yeah.  Go ahead.

 2                    MR. SHERRY:  So Takeda also has an

 3          argument, which I'll agree is secondary to the

 4          representation argument, but I think this is

 5          foundational, regarding its argument that Par is

 6          not a party to the Takeda/Mylan contract, but

 7          notwithstanding that, Par's interests are at

 8          stake here and you can see that if you look at

 9          that either broadly or narrowly.  Broadly

10          speaking, it's Mylan's unlawful sales that are

11          both the initiating act that presents the main

12          action and are also the cause of damages to Par.

13          And Par has an interest in enjoying the benefits

14          of its contractual relations with Takeda and its

15          contractual relations with its distribution

16          partners and both of those contractual benefits

17          have been damaged and would be damaged further

18          barring a PI from Mylan's launch.  And these

19          type of interests, the contractual relation

20          interests and these direct economic interests

21          are the sort of interests that have been deemed

22          sufficient for intervention by the third circuit

23          or in the third circuit.  And in particular I'm

24          thinking of, referring to the Chrysler v. U.S.
```

```
 1        Forest Services case and the Michaels Stores v.

 2        Castle Ridge.  You can also look at these

 3        somewhat more narrowly.  There's the contract

 4        that Par lost during Mylan's brief launch last

 5        year.  Mylan's improper contacts with Par's AG

 6        customers and again, the same damage that Mylan

 7        would do from its launch if it launched again.

 8        And each of these things -- each of these harms

 9        to Par are specifically named in Takeda's

10        complaint as examples of Mylan's wrongful

11        action.  And so for that reason Takeda has

12        brought Par's harm and Par's interests directly

13        into the main action.

14                   THE COURT:  But isn't Takeda's

15        action breach of contract and patent

16        infringement?

17                   MR. SHERRY:  Yes.  And those are

18        intended to stop -- the entire purpose of that

19        is to stop Mylan's unlawful sales.  And in fact,

20        the acts that I just mentioned regarding Mylan's

21        interference with Par's contracts, those are

22        examples of the damage that Mylan is doing in

23        breach of the contract and by infringing the

24        patents at issue.
```

10

```
 1              THE COURT:  All right.
 2              MR. SHERRY:  And so turning to the
 3    representation question, there are basically
 4    three reasons why Takeda doesn't adequately
 5    represent Par's interests here.  First, Par and
 6    Takeda seek different damages.  They're closely
 7    related, Your Honor, but they're not actually
 8    the same damages.
 9              THE COURT:  I understand you're
10    seeking different damages.
11              MR. SHERRY:  Okay.  I'll move on,
12    but I'll just note that Bode Bry v. Strang and
13    Michaels Stores both recognize that a party
14    doesn't represent a potential intervenor if it's
15    seeking a different remedy.  The second reason
16    why Takeda doesn't represent --
17              THE COURT:  But of course you're
18    seeking a different remedy based on different
19    causes of action.  You're seeking -- you want to
20    file causes of action that are not Takeda's
21    causes of action, right?
22              MR. SHERRY:  That is correct.  I
23    can't speak to whether that alone is sufficient.
24    I think the critical point here is that the end
```

11

1       result that we're attempting to seek are not

2       identical.  As in Takeda is seeking X million

3       dollars for its damages and Par is seeking Y

4       million dollars for its damages.  They're sort

5       of adjacent to each other because they're both

6       related to harm to the AG market that Par and

7       Takeda share, but they are different pools of

8       money.  And if Takeda and Par are successful,

9       Mylan would be paying each of those separately

10      to Takeda and to Par.  And so that's the nature

11      in which they're different.

12                    THE COURT:  Okay.

13                    MR. SHERRY:  The second reason is

14      that -- and this is clear from the PI briefing,

15      is that Takeda has not presented the court with

16      the harm that is particular to harm -- sorry,

17      that is particular to Par that Par would suffer

18      from Mylan's re-entry into the market.

19                    THE COURT:  Right.  But they

20      have -- yeah.  Actually that's right.  Yeah.

21                    MR. SHERRY:  And there's no

22      structured reason why that has to be the case.

23      Obviously Takeda could have presented that

24      information.

```
 1              THE COURT:  Probably not for the

 2      same reason you couldn't argue the merits

 3      because you hadn't seen their contract.  They

 4      don't know what your -- I mean, there's a gulf

 5      between the two of you in terms of what you know

 6      about each other.

 7              MR. SHERRY:  That is fair enough,

 8      Your Honor, although Takeda has quite a lot of

 9      information regarding Par's sales, because

10      obviously Takeda gets royalties from Par's

11      sales, and so there's reporting as far as that's

12      concerned.  I don't claim that Takeda has

13      perfect knowledge on that.  That's almost

14      certainly true.  The point is that there's

15      particularly harm to Par that is not being

16      represented -- presented to the Court right now

17      or is not absent our intervention, and so sort

18      of regardless of what could happen, there's, in

19      fact, a lack of adequate representation with

20      respect to that particular issue.  And then the

21      third basis for a lack of adequate

22      representation is Mylan's defense, because

23      Mylan's defense -- and again, we don't have a

24      completely clear view onto everything that's
```

```
 1     going on on the merits phase, but from what we
 2     can tell, Mylan's defense appears to be that
 3     Takeda has, in fact, authorized the launch,
 4     authorized their entry into the market.  And
 5     therefore, in effect, Mylan is saying that to
 6     the extent Par is harmed by that, it is Takeda's
 7     doing, not Mylan's, because Takeda authorized
 8     that.  That appears to be the gist of Mylan's
 9     defense with respect to Par's issues.  And given
10     that, those allegations and that state, Takeda
11     is just not in a position where it can be
12     representing Par's interests if Mylan, the other
13     party in this, is saying that, in fact, it's
14     Takeda is causing the harm not Mylan.
15              THE COURT:  Still the Takeda
16     position is Mylan is wrong, they're breaching
17     the contract, which is exactly your position,
18     right?
19              MR. SHERRY:  Yes.  I would agree
20     that there is -- there is certainly agreement
21     between Takeda and Par with respect to the
22     breach of contract issue.  That's correct.  But
23     that's --
24              THE COURT:  And doesn't that, if
```

14

```
 1    Takeda is right, doesn't that resolve -- doesn't

 2    that sort of moot your third reason?

 3                    MR. SHERRY:  If Takeda -- sorry,

 4    if Takeda is right, then -- and of course we

 5    agree that that's the case, then the third

 6    reason wouldn't come into effect.  But I assume,

 7    and I don't think Mylan will disagree with this,

 8    that Mylan intends to maintain this position

 9    throughout the case.

10                    THE COURT:  No.  That's it.  They

11    have a view, Takeda has a view, but Takeda's

12    view is your view.

13                    MR. SHERRY:  On this particular

14    issue, yes.  But there are -- what I'm saying is

15    that there are implications of this argument by

16    Mylan, which is to say that if Mylan is right,

17    then Takeda is in a position where it may be

18    just trying to defend its own interests, not

19    merely agreeing to -- I'm sorry, I'm not saying

20    this very clearly.  If Mylan -- since Mylan is

21    presenting this issue, Takeda is in a position

22    where it is not merely arguing the agreed

23    position where Par and Takeda agree that Mylan

24    is simply wrong.  It also has some interest in
```

```
 1        protecting itself from the implications of this

 2        argument.

 3                    THE COURT:  Okay.  So that's your

 4        intervention as of right argument, right?

 5                    MR. SHERRY:  Right.  Excuse me,

 6        intervention is also warranted in the

 7        alternative.

 8                    THE COURT:  Yeah, yeah, let's not

 9        bother with that.  So let me hear from Mr.

10        Fleming.  Thank you, Mr. Sherry.

11                    MR. SHERRY:  Thank you, Your

12        Honor.

13                    MR. FLEMING:  Good morning, Your

14        Honor.

15                    THE COURT:  Hi, Mr. Fleming.  How

16        are you?

17                    MR. FLEMING:  Very good.  Thank

18        you.  I'll just be very brief.  I think reading

19        between the lines of what you just said --

20                    THE COURT:  Okay, you shouldn't do

21        that.

22                    MR. FLEMING:  Okay.  I won't do

23        that.  There is no basis for Par to assert any

24        of the patents in this case.  They have no
```

```
 1        exclusionary rights.

 2                     THE COURT:  You don't need to do

 3        that part.

 4                     MR. FLEMING:  Okay.  That was the

 5        part I was reading.

 6                     THE COURT:  Okay.

 7                     MR. FLEMING:  There is no subject

 8        matter jurisdiction and I think I just heard

 9        from Mr. Sherry that he agreed that with respect

10        to Takeda's view is your view.  And that is

11        correct with respect to Takeda and Par are both

12        seeking the same -- and we cite this Hoots case.

13        We are both seeking that Mylan has breached

14        1.2(d) of the license agreement and we are

15        seeking a preliminary injunction to stop that

16        and that is exactly what Par wants.  So we're on

17        the same footing there.  Par has no rights under

18        those patents, but in any event we're seeking

19        the same thing.  I also heard Mr. Sherry talked

20        about a tortious interference and unfair

21        competition claims, which are state law claims

22        and he went into agreements between Par and its

23        distributors.  Those clearly have nothing to do

24        with the complaint that we brought against
```

1    Mylan.  The complaint against Mylan, as Your

2    Honor noted a short while ago, is a breach  of

3    contract and patent infringement on 17 orange

4    book patents, so to the extent Par is now

5    arguing for tortious interference and

6    interference of business to come into the case,

7    there is new claims, new facts, new issues that

8    go beyond anything that's in the case.  We

9    believe there should be -- that Par should not

10   intervene, period.

11              THE COURT:  By the way, do you

12   think the -- and this is a preview of coming

13   attractions, I guess.  Do you think the question

14   of interpretation of section 1.2(d) of the

15   contract, is that a question of law?

16              MR. FLEMING:  I think it is a

17   question of law.  To the extent that the parties

18   will be, at some point, perhaps not at

19   preliminary injunction, asking you to determine

20   that, I think that the at the preliminary

21   injunctions you will have to look at the

22   likelihood of success of one party to prevail at

23   that point.  I also think we have to look at the

24   intent of the parties and under the context of

```
 1     how that agreement came to be between Mylan and

 2     Takeda and how that resolved an ANDA litigation

 3     and how --

 4               THE COURT:  So are you saying that

 5     there's a necessity for extrinsic evidence?

 6               MR. FLEMING:  I think the language

 7     of 1.2(d), as I'm interpreting it, is

 8     unambiguous.  And no, I'm not looking for

 9     extrinsic evidence or parole evidence.  I think

10     it is interesting, as you'll hear from Mylan,

11     they have a different interpretation.  We have

12     competing interpretations and that's an

13     interesting question whether competing

14     interpretation in and of itself makes them

15     ambiguous or not.

16               THE COURT:  There's a zillion

17     cases that say that's not the case, otherwise

18     every contract would be ambiguous if people were

19     arguing about it.

20               MR. FLEMING:  Correct.  So our

21     position is unambiguous, Mylan has breached

22     1.2(d) because they have not satisfied that all

23     the patents that were asserted were adjudicated.

24               THE COURT:  Okay.  And basically
```

1       in terms of this motion to intervene, the case

2       that you think is more -- is your best case is

3       this Hoots case, right?

4                   MR. FLEMING:  Well, I think --

5       yes, Your Honor.  Par and Takeda are aligned to

6       the extent that A, they're saying Mylan has

7       breached our agreement.  That's the Takeda/Mylan

8       agreement.  Par is not even a party to that

9       agreement.  And to the extent they're asserting

10      patent infringement, I looked at their complaint

11      in intervention, it's basically a copy job of my

12      complaint, the same 17 patents and a hundred

13      plus paragraphs that are exactly the same.  We

14      are aligned.

15                  THE COURT:  Okay.  Do you have any

16      opinion on the question I asked Mr. Sherry with

17      whether intentional interference with contract

18      requires a breach or can it just be a quote

19      termination.

20                  MR. FLEMING:  I don't have an

21      opinion, but I will say it's not in my case,

22      it's not in the Takeda/Mylan case, so I think

23      that highlights the point of a different issue

24      that's really not part of our case.

```
1              THE COURT:  That's a fair
2      response.  Okay.  Is there anything else you
3      want to tell me?
4              MR. FLEMING:  No, thank you, Your
5      Honor.
6              THE COURT:  Mr. Sherry, is there
7      anything further you want to say?
8              MR. SHERRY:  Yes.  Just a few
9      points, Your Honor.  One, the case that I was
10     referring to that I didn't have a cite for you
11     when I was up here before, that is ASDI
12     Incorporated v. Beard Research and the cite is
13     11 A 3d --
14             THE COURT:  Is that in the
15     briefing?
16             MR. SHERRY:  No, I don't believe
17     it's in the briefing, Your Honor.
18             THE COURT:  Okay.  What is it?
19             MR. SHERRY:  11 A 3d 749 and the
20     pin cite is 751 and that's Delaware Supreme
21     Court 2010.
22             THE COURT:  Okay.  That's
23     certainly a good authority.  Anything else?
24             MR. SHERRY:  Yes.  Just with
```

```
 1        respect to 24(a), that doesn't -- that does

 2        allow a certain overlap in -- sorry, that does

 3        permit issues that are not in the main case.

 4        24(a) simply requires a common issue.  In fact,

 5        that's true for B as well.  I think it's

 6        commonly the case that intervenor's interests --

 7        intervenor's claims don't totally overlap with

 8        the interested parties.

 9                    THE COURT:  In terms of claims,

10        your claims don't overlap at all in terms of

11        claims that have a chance of going forward.

12                    MR. SHERRY:  They overlap in terms

13        of -- and I assume by that you're referring to

14        the state law claims?

15                    THE COURT:  Yes.

16                    MR. SHERRY:  They overlap in terms

17        of both common issues of law and fact with

18        respect to 24(b) and in terms of an interest

19        being at stake, which is the 24(a) rule.

20                    THE COURT:  Okay.

21                    MR. SHERRY:  And that's what's

22        required.  And the last thing I wanted to

23        mention is Mr. Fleming mentioned the Hoots case.

24                    THE COURT:  Yes.
```

```
 1              MR. SHERRY:  The Hoots case is
 2    distinct from the damages issue that I mentioned
 3    before in that Hoots involved an intervenor and
 4    an existing party who were seeking that the
 5    exact same pile of money go to the same place,
 6    which is distinct from the difference in damages
 7    that are sought by Par and Takeda.
 8              THE COURT:  All right.
 9              MR. SHERRY:  And that's all, Your
10    Honor.
11              THE COURT:  Okay.  So I'm going to
12    take a brief recess and I'll be right back.  All
13    right.  Don't go anywhere.  We'll be in recess.
14              (Short recess.)
15              THE COURT:  All right.  Let's be
16    seated for a minute.  So federal rules of civil
17    procedure 24(a)2 essentially says that somebody
18    can intervene in the litigation if it
19    demonstrates the following, that its motion is
20    timely, that it has a sufficient interest in the
21    litigation and that its interests may be
22    affected as a practical matter by the
23    disposition of the action and its interest is
24    not adequately represented by an existing party
```

```
 1          in the litigation.  In my opinion the interests

 2          that Par has in the lawsuit that Takeda filed is

 3          whether or not the contract permits Mylan to

 4          launch.  And in that regard, the interest is

 5          perfectly well represented by Takeda, which also

 6          does not -- which has the same interpretation of

 7          the contract and has the same interests in not

 8          having Mylan launch, so I don't think that I

 9          should allow Par to intervene as a matter of

10          right.  I note in -- I do note in regard to that

11          point, that -- and its Par's motion to

12          intervene, page 11, it concedes that Par and

13          Takeda are, quote, presently aligned in seeking

14          to adjoin the sale or marketing of Mylan's ANDA

15          products.  So I deny it as a matter of right.

16                    In terms of as a matter of

17          discretion under rule 24(b)1(B), there may be a

18          common question of law or fact relating to the

19          interpretation of this contract, but the central

20          consideration in exercising discretion is

21          whether allowing intervention will cause delay

22          or prejudice.  And it seems to me that allowing

23          intervention will cause both delay and

24          prejudice.  The delay simply because Par wants
```

```
 1      to assert and it's the thrust of its case, are
 2      additional claims which Takeda can't possibly
 3      assert and prejudice because it's just going to
 4      increase the overall cost of the litigation, as
 5      Par has pointed out in its briefing and says
 6      Takeda won't do in terms of discovery and trial.
 7      And what's more is Mr. Sherry said something
 8      today which, you know, hints at some day Par may
 9      be, down the road may be suing Takeda or at
10      least will be thinking about it.  So I don't
11      think it's a good idea to allow Par to intervene
12      in this case.  If it turns out that Par files a
13      lawsuit in this district and I have jurisdiction
14      over it, you know, we can revisit the question
15      of whether or not there should be some
16      coordination between the two cases.  But I'm not
17      going to allow them to intervene, so I'm going
18      to deny that motion.
19                  All right.  So preliminary
20      injunction, Mr. Fleming.
21                  MR. FLEMING:  Good morning again,
22      Your Honor.  May I approach with some, some
23      slide materials?
24                  THE COURT:  Okay.
```

```
 1                    MR. FLEMING:  And one other

 2     housekeeping matter, Your Honor, before I start.

 3     The parties did, in an attempt basically to

 4     follow your guidance with respect to this whole

 5     sealing and what's sealed and what can be

 6     discussed and appreciating that Your Honor would

 7     have probably have no view of us like trying to

 8     seal the courtroom, we're not even asking that.

 9                    THE COURT:  Good choice.

10                    MR. FLEMING:  So what we did was

11     we put together kind of a chart.  May I approach

12     again?

13                    THE COURT:  This is like some code

14     so I'll understand what you're saying?

15                    MR. FLEMING:  Exactly, Your Honor.

16                    THE COURT:  Okay.  I'm fine with

17     that.  And honestly, I don't think the

18     particular dates and dollar figures, I doubt

19     that any of them actually matter, so I think you

20     can probably do this without ever actually

21     referring to this.  What I'll call the Mylan

22     guest enter date, I got the general idea of when

23     that is.  I think you can just call things

24     delay, whatever, I will basically understand,
```

1      but if you feel it necessary, go ahead.

2                  MR. FLEMING:  That's a very fair

3      comment, Your Honor.  And you will notice when

4      we go through the slide, there are no code A,

5      code B or whatever.  I deliberately left them

6      out and appreciating that you have read all the

7      briefs and you know basically all the things

8      we're talking about anyway.  So I think we can

9      do that without the code and I also have

10     informed the court reporter that we are using

11     this type of code and that maybe a reference

12     here or there to a letter.

13                 THE COURT:  Seems to me that the

14     main things that you need to address in

15     connection with this are either the likelihood

16     of success on the merits which has to do with

17     this 1.2(d) interpretation, 1.2(d) -- 1.2 part

18     of the agreement.

19                 MR. FLEMING:  Yes, Your Honor.

20     That's exactly what I plan to do.

21                 THE COURT:  And a little bit with

22     the irreparable harm, because I'm not convinced

23     that there actually is any irreparable harm to

24     Takeda here, which is essentially just because

1       there's a date in the future when these generics

2       are going to be entering the market and it seems

3       to me that in terms of -- and Mylan can

4       certainly pay any damages you can come up with

5       and that because, because of two reasons, one of

6       which is I already did this kind of analysis

7       for, coincidentally enough, your client in

8       Takeda versus West-Ward and so I expect that

9       this same data will come out in the future and

10      allow people who are more expert than me to

11      figure out what the damages are if Mylan is

12      wrongfully on the market.  But in any event, why

13      don't you get to that second?

14                  MR. FLEMING:  I understand what

15      you're saying and we will get to irreparable

16      harm.  And as you will appreciate as we go

17      through the slide, the focus mainly is the

18      likelihood of success and interpretation of

19      1.2(d).  I am going to do a little background to

20      give the court a background as to what the

21      products at issue were and what the products

22      were in the Hikma case.

23                  THE COURT:  So, just tell me, Mr.

24      Fleming, because I've seen you multiple times

28

1       before and respect your abilities to do this

2       sort of thing, how long do you expect your

3       presentation to be?

4                    MR. FLEMING:  A little bit over 30

5       minutes, maybe.

6                    THE COURT:  That's good.

7                    MR. FLEMING:  Okay.  Turning to

8       slide 1, we're here for a preliminary

9       injunction.  As the Court appreciates, the legal

10      standard requires four factors and appreciating

11      what Your Honor just said, we are going to focus

12      on the reasonable likelihood of success on the

13      merits as well as try to change your mind with

14      respect to irreparable harm as to what harm

15      Takeda will suffer as a result of Mylan's breach

16      of 1.2(d) of the license agreement.

17                   Slide 2, there are -- the four

18      points with respect to likelihood of success are

19      Mylan has launched its ANDA product without a

20      license from Takeda and is in breach of the

21      license agreement.  The West-Ward litigation,

22      which is the Hikma case, we referred to both

23      ways, is exactly the case you were referring to

24      before, which did involve an injunction and the

1    accounting that you referenced.  We do not

2    believe and hopefully will demonstrate to you

3    that the West-Ward litigation was not a 1.2(d)

4    trigger.  Point number 3, we also hope to show

5    that, that Takeda and Mylan, when they settled

6    their underlying ANDA litigation, they did not

7    contemplate or intend the West-Ward litigation

8    to be a trigger with respect to this license.

9                THE COURT:  Wouldn't that require

10   extrinsic evidence?

11               MR. FLEMING:  No, Your Honor, I

12   don't believe it requires extrinsic or parole

13   evidence.  I think looking within the four

14   corners of the license agreement, you will see

15   how not only the language of 1.2(d) doesn't

16   apply to Hikma, but you also see by looking at

17   the MFN provisions as well as all -- all the 1.2

18   factors, which are A through F, are all

19   predicated on an ANDA product being launched and

20   they're all predicated on the idea of a certain

21   time period that Mylan has to wait in relation

22   to what we call the first first.  And that's

23   Par, Amneal and Watson.  And so to the extent

24   that is in, and in the four pages, we believe

1      that not to be extrinsic evidence.

2                    THE COURT:  No, no, if it's in the

3      agreement, yeah, okay.

4                    MR. FLEMING:  So there's a slide

5      on that.  And hopefully I can convince you.  And

6      then the final point is from the license

7      agreement, it's clear that Mylan has admitted

8      that if they breached the agreement, that they

9      are infringing patents-in-suit.  There's 17

10     orange book --

11                   THE COURT:  Presumably we're going

12     to concentrate on 2 and 3.  I don't think we

13     need to say any more about 1 and 4.

14                   MR. FLEMING:  Okay.  Done.  Okay.

15     Next slide, slide 4, please.  A little bit of

16     how we got here today, what the recent events

17     are.  We learned on November 25 or it appears

18     from the FDA website that Mylan launched its

19     infringing ANDA product.  On November 26th we're

20     aware of a first sale.  On December 2nd we filed

21     our complaint in this case and on December 5th

22     we filed the present motion for preliminary

23     injunction.  And I think it's interesting to

24     also point out that we were able to reach an

```
1    agreement between Mylan and Takeda to avoid

2    figure a TRO in this case with respect to

3    Mylan's sales and distribution of the ANDA

4    product.

5                THE COURT:  And that speaks well

6    of the two sides working together, but that's

7    kind of irrelevant to my decision, right?

8                MR. FLEMING:  Yes and no, Your

9    Honor.  I think when we get to irreparable harm,

10   it will be a factor because to the extent Mylan

11   agreed to stop selling the product, what harm

12   are they going to have if you continue that?

13               THE COURT:  I don't like to use

14   agreements that seem to me to be -- I mean, I'm

15   dubious on that one.

16               MR. FLEMING:  Okay.  Slide number

17   5, please.  Little background with respect to

18   the original litigation.  It was an ANDA

19   litigation.  It was a litigation that involved

20   Mylan's ANDA.  In October of 2016 Takeda filed a

21   complaint.  The case was settled in November of

22   2017.  The settlement was the settlement

23   agreement and licensing agreement that we're

24   talking about today.  The license agreement
```

```
 1     granted Mylan a non-exclusive license to market
 2     the ANDA product.  The generic entry dates are
 3     the 1.2 dates that we're going to be talking
 4     about in greater detail.  As the Court is aware
 5     1.2(a) is a set date.  That date hasn't come
 6     yet.  There are additional triggering events.
 7     1.2(b) through (f), our position is that none of
 8     those triggering events have occurred and thus
 9     Mylan's launch of an ANDA was in breach of at
10     least section 1.2 as well as 1.4, which is the
11     marketing provisions.
12               Next slide please.  This is what I
13     just said.  Flip to the next slide, please.
14     Takeda's Colcrys products, that's the product
15     Takeda sells, it's a brand product, it's
16     indicated for three indications, prophylaxis of
17     gout flares, treatment of gout flares and FMF,
18     which is a bloating in the stomach and other
19     areas of the body.  It has a dose form of a
20     tablet and it was launched in September of 2009.
21               Next slide, please.  The West-Ward
22     litigation.  This is the case that Mylan
23     believes was the triggering events for the
24     summary judgment and in this case triggered
```

```
 1      1.2(d).
 2                     Background on this case.  This
 3      case was originally filed in October 2014.
 4      Important to note there were five patents that
 5      were originally asserted in the case.  Takeda
 6      then asserted infringement of additional three
 7      patents, so there were 8 patents asserted in the
 8      case.  During summary judgment briefing, which
 9      was before Your Honor, the parties agreed to
10      dismiss with prejudice five of those patents.
11                     THE COURT:  Those were the five
12      original patents, right?
13                     MR. FLEMING:  No.  There's a mix.
14      It's four original and one of the three.  So
15      they are not all the original.
16                     THE COURT:  Okay.
17                     MR. FLEMING:  And I have a slide
18      that will show that to you.
19                     THE COURT:  No.  I believe you.
20                     MR. FLEMING:  I think that's an
21      important point.  And then the final point is
22      your summary judgment decision of December 2018
23      where this court held that three of those
24      patents were adjudicated to not be infringed
```

```
 1      under the patents.

 2                    The next slide, please.  Little

 3      bit of background about Hikma's Mitigare

 4      product.  I think this is important because it

 5      goes to whether the parties contemplated or

 6      didn't contemplate this case being a final

 7      decision pursuant to 1.2(d).  The Hikma Mitigare

 8      product was approved in September 2014.  It was

 9      a 505(b)2 product, i.e., it was not an ANDA

10      product.  It was not a Colcrys ANDA.  So unlike

11      the 10 other parties that are subject to

12      settlements with Takeda, they all filed ANDAs to

13      the Colcrys product, relying on the Colcrys

14      ANDA.  That wasn't the case with Mitigare.

15      Important, Hikma launched Mitigare in October of

16      2014.  Why is that important?  It's important

17      that the product was on the market before and

18      during the Mylan litigation.  It's on the market

19      today.

20                    THE COURT:  But there was an

21      injunction in the middle there.

22                    MR. FLEMING:  You've got me on

23      that one.  I don't know that for sure.  If you

24      say so.
```

```
 1              THE COURT:  Let me think about
 2     this for a second.  Yeah, that's the reason why
 3     I had to -- yeah, I mean, Takeda ended up
 4     posting a bond because they joined the Mitigare
 5     product and I think that got reversed by the
 6     federal circuit and then Mitigare launched.  But
 7     there was like a chunk of time when Mitigare was
 8     off the market, I'm pretty sure.
 9              MR. FLEMING:  Okay.  I'll confirm
10     that one way or the other when Mylan gets to
11     speak.  Let's go to the next slide, please.  So
12     I think it's important to note and compare the
13     Mitigare product with the Colcrys product.
14     Mitigare is another branded product.  It's not
15     an ANDA product.  It's branded.  It has only one
16     indication, prophylaxis of gout flares.  And
17     actually the Mitigare label specifically states
18     that you can't use Mitigare for acute treatment.
19     And as you may recall, the summary judgment
20     decision got into the whole induced infringement
21     and whether a doctor was prescribing or not
22     prescribing.  It's a different prescribing than
23     Colcrys.  It has different indications.
24     Importantly it has a different form.  It's a
```

```
 1      capsule versus a tablet and we'll see how the
 2      agreement talks about tablets, not capsules, for
 3      example.  It was launched in October 2014 and
 4      probably most importantly that Mitigare, as it
 5      is not related to Colcrys, it's not AB rated.
 6      It can't be substituted at the pharmacy.  So
 7      it's different, it's not -- and we would say not
 8      subject to this license agreement.
 9                  The next slide, please.  And this
10      is a little summary slide.  It's the side by
11      side, same information, different dosage form,
12      different indications.  Mitigare only has one
13      indication.  Both products are brand products.
14      And again, Mitigare is not AB rated and not
15      substitutable at the pharmacy.
16                  Slide 12, please.  Next slide.
17      1.2(d), this is really what brings us here, Your
18      Honor.  Let's look at the key words in this, in
19      this section.  We need a final court decision.
20      That's defined as exhibit A.  I don't think
21      there's any dispute that a final court decision
22      and the definition requires that there was no
23      further appeal.  That's not in dispute.
24                  THE COURT:  Right.
```

```
 1                    MR. FLEMING:  It goes on, a final
 2        court decision, holding, i.e., a decision, that
 3        all, all unexpired claims of the licensed
 4        patents -- licensed patents are a defined term,
 5        there's 17 of them -- that were asserted and
 6        adjudicated against a third party are either not
 7        infringed or any combination of not infringed
 8        and invalid and unenforceable.  This dispute, I
 9        think in the most simple of terms, Your Honor,
10        comes down to when you say were asserted, are
11        you saying there were 8 patents asserted, which
12        is what we said, which there were 8 patents in
13        the case and only three patents were ultimately
14        adjudicated in your summary judgment.  In a
15        nutshell that's pretty much most of the fight.
16                    THE COURT:  And of course we're
17        not actually talking about patents, we're
18        talking about claims, right?
19                    MR. FLEMING:  Well, yes, claims of
20        patents.  That one they're even more claims.
21                    THE COURT:  Mr. Fleming, you've
22        done lots of patent cases.  Have you ever gone
23        to trial or even summary judgment on every
24        single asserted claim or have you, as most
```

1    courts required, trimmed them down as you go

2    along?

3                    MR. FLEMING:  I don't want to be

4    kind of smart, but there are patents that only

5    have one claim, so the answer to your question

6    is yes, but you're exactly right that in this

7    day and age and even before Your Honor where

8    there are multiple patents being asserted and

9    multiple claims that the courts do encourage the

10   parties to reduce the number of claims.  I think

11   you do have rights to every claim and that is a

12   property right and you probably do have the

13   right to assert each and every claim, but to the

14   extent courts have no interest --

15                    THE COURT:  In your

16   interpretation, barring the 1 or 2, because I

17   think I actually -- I think I had a case now

18   that you actually mentioned it, one asserted

19   patent, two claims, they were both asserted and

20   both asserted, so it's possible, but as a

21   practical matter -- as a practical matter, if

22   the interpretation you want to give to this,

23   which is any claim that was ever asserted also

24   has to be adjudicated, basically this is never

1    going to come into play, particularly where the

2    background is we know you've got 17 or 18

3    patents covering aspects of the possible

4    generics that could be introduced, right?

5                    MR. FLEMING:  Actually I'll give

6    you an example where it does come into play.

7    And we're going to talk about it later.  If you

8    think of the situation where Your Honor is

9    aware, which an ANDA applicant serves a notice

10   letter, raises and says in the notice letter to

11   the brand company that our ANDA does not

12   infringe, let's say 10 patents.  Okay?  If the

13   brand company files a complaint within 45 days,

14   there is that automatic 30-month stay.

15                    THE COURT:  Yes.

16                    MR. FLEMING:  Okay.  To resolve

17   that 30-month stay under the Hatch Waxman Act,

18   that generic has to resolve all asserted and get

19   an adjudication with respect to all those

20   patents.  So in that case, yes, they have to

21   resolve all the claims, because if they want to

22   get out from under the 30-month stay they have

23   to resolve all those issues substantively.

24                    THE COURT:  That's adjudication,

1      that's for the FDA, right, because the FDA won't

2      approve it unless they have what you're talking

3      about, right?

4                    MR. FLEMING:  Right.  The 30-month

5      stay.  But this paragraph here, 1.2(d) is itself

6      part of generic launches, so what are we talking

7      about here?  We're talking about a situation

8      where a generic perhaps can get out from under a

9      30-month stay, get out and launch.  What are

10     these provisions supposed to do?  They're

11     supposed to protect Mylan, so they agree to a

12     date in 1.2(a).  These other provisions are to

13     protect Mylan that if something were to happen

14     or to change, change the landscape, a generic

15     getting out from -- getting permission to launch

16     their product.  That is a change.  And under

17     this, there is some language that's deleted with

18     the three dots at the beginning, but there is,

19     after a certain amount of period, Mylan would

20     get to go if that generic beat the 30-month

21     ANDA, 30-month statutory requirement.  And to do

22     that they have to address all the asserted

23     claims.  And we have the word here, right there,

24     all.

```
1                THE COURT:  But it is the case
2     that for FDA -- maybe not for the 30-month, but
3     for -- I thought it was the FDA had to approve,
4     they wouldn't approve as long as the 30-month
5     stay was in play or until they got a final
6     judgment that perhaps adjudicated all the
7     claims, but dismissing them would count as
8     adjudicating them as opposed -- right?
9                MR. FLEMING:  That's an
10    interesting point again, Your Honor.  That did
11    change in December of 2016.  That change,
12    though, only applies to ANDAs filed after, I
13    believe it's December 5, 2016.  Interestingly
14    here, Mylan's ANDA was filed before and does not
15    apply to what you just described, a dismissal.
16    So that's why here, where we do have a dismissal
17    with prejudice, both Takeda dismissed with
18    prejudice as did Hikma.  They voluntarily
19    dismissed their affirmative defense of non
20    infringement and invalidity.  So you have a
21    dismissal.  That dismissal does not count pre
22    December 2016 for ANDAs as an adjudication.  So
23    what we have here is we have 8 patents asserted
24    and even more claims, but I'm just talking about
```

```
 1    the patents.  We have at least 8 patents
 2    asserted, and only three patents were actually
 3    adjudicated.  And so if the Hikma decision is a
 4    final decision, which we dispute anyway, even
 5    under that construction, we don't think Hikma
 6    meets a final court decision because with
 7    respect to the five patents that were not --
 8    were not adjudicated, those five patents,
 9    there's no holding that either they're not
10    infringed or a combination of not infringed and
11    invalid.  Silence.  And so because of that, this
12    can't apply, we say.
13                  THE COURT:  But isn't it the
14    case -- let's assume you had 8 asserted patents
15    in the Hikma litigation, but there are only
16    three asserted and adjudicated pad events,
17    right?
18                  MR. FLEMING:  Correct.  What about
19    this word all?  All the patents that were
20    asserted had to have been adjudicated.
21                  THE COURT:  Well, all unexpired
22    claims that were asserted and adjudicated.
23    That's like that whole sentence or that whole
24    phrase makes sense, doesn't it.
```

1          MR. FLEMING:  I know exactly where

2     you're going and that's actually one of Mylan's

3     arguments.  I think the answer, what you're

4     trying to do, it's almost like -- I don't mean

5     this disrespectfully.  It's like you're going to

6     the last chapter of the book.  You're looking to

7     see what happened in the decision.  The decision

8     was there was an adjudication of three patents.

9     Agreed.  That decision, how many patents were

10    part of that decision?  Oh, there were three,

11    because however many were asserted would have

12    been adjudicated because that's what the

13    decision says.  If you do it that way, then the

14    word asserted and adjudicated, basically either

15    have the same meaning --

16          THE COURT:  They don't have the

17    same meaning, they work together, but go ahead.

18          MR. FLEMING:  Either have the same

19    meaning or the word asserted means nothing

20    because ultimately you're getting an

21    adjudication of the three patents.

22          THE COURT:  So when you go on and

23    it says they're either not infringed or any

24    combination of not infringed and invalid or

1    unenforceable, does the little 1 not infringed

2    add anything to the second clause there?

3               MR. FLEMING:  I think it's an or,

4    but I think what it's telling you is a final

5    adjudication.

6               THE COURT:  No, no.  So the second

7    clause is any combination of not infringed and

8    invalid or unenforceable.  Isn't something where

9    all patents are not infringed a combination of

10   not infringed and invalid or unenforceable?

11              MR. FLEMING:  If I'm understanding

12   you right, you can't infringe an invalid patent.

13              THE COURT:  What I'm pulling out

14   or what I'm asking for you to comment on is

15   there's a certain amount of redundancy that goes

16   on in these things, right?  So it says they're

17   either not infringed or any combination of not

18   infringed and invalid or unenforceable.

19              MR. FLEMING:  No, they're

20   different.  There's no redundancy.  The

21   answer is not infringed means that all the

22   patents that were adjudicated were found to be

23   not infringed.  That's what you did in the Hikma

24   case, you found that the three patents at issue

1    were not infringed.

2              THE COURT:  And isn't that also a

3    combination of not infringed and invalid or

4    unenforceable where not infringed is all and

5    invalid or unenforceable is zero?

6              MR. FLEMING:  Well, I would look

7    at it differently.  I would say that one is one

8    hundred percent are infringed and two, you could

9    either have a combination wear 2a patent is not

10   infringed because you've been able to design

11   around and secondly, other patents were either

12   obvious or for some other basis invalid.  So

13   what that, to my mind means, you either in one

14   get all of them as not infringed or in two, you

15   can either be not infringed or some other basis.

16   And the other other basis are invalidity or

17   enforceability.  And it all goes back to the

18   Hatch Waxman idea where you have to check a box

19   for each of the asserted patents, for example,

20   my 30-month stay example.  You have to check a

21   box next to each patent and you can either check

22   all infringed or you can do some infringed and

23   some invalid.  But again, you have to get all of

24   them one way or the other.  I think I see them

1    as different, Your Honor.

2              THE COURT:  So I haven't seen this

3    too much, but could a generic bring a

4    declaratory judgment against a brand new

5    company?

6              MR. FLEMING:  Yes, if they don't

7    get sued within 45 days they can bring a

8    declaratory judgment, but there would be no

9    30-month stay.

10             THE COURT:  And when generic

11   brings a declaratory judgment, does the branded

12   company have to actually assert any claims?

13             MR. FLEMING:  In the form of like

14   a counter claim?

15             THE COURT:  Yeah.

16             MR. FLEMING:  I don't know if they

17   have to.  I guess they could give a covenant not

18   to sue or some other basis.

19             THE COURT:  So let's assume they

20   didn't assert any counter claim and then the

21   generic one, they would have been adjudicated on

22   whatever the generic brought or the patents were

23   invalid presumably, would that be a scenario

24   where the asserted and the adjudicated would not

1        be exactly the same?

2                    MR. FLEMING:  It could be.  But I

3        think here, I'm trying to say they're not the

4        same, they're different, asserted and

5        adjudicated and that they both have to be

6        present for this to be a final court decision

7        that would trigger this.  And if again, in the

8        context of this is in 1.2, generic entry dates,

9        if we're looking for a situation that changes

10       the status quo and puts a new product out there

11       on the market, the generic would have to address

12       both the asserted patents and get an

13       adjudication with respect to those patents.

14       That's what gets them on the market and that's

15       what would change and perhaps give Mylan the

16       benefit of an earlier date than the date in

17       1.2(a) that they agreed to.

18                    THE COURT:  All right.  How do

19       the -- the other subsection, the 1.2, which I

20       think was addressed some in the briefing, how

21       did they impact your argument, if at all?

22                    MR. FLEMING:  They do, Your Honor.

23       And first of all, they give context of what 1.2

24       is all about.  The section 1.2 is about generic

1    entry dates.  It's the date when Mylan, with

2    permission, can go to market with their ANDA

3    product.  This is what they agreed to when

4    settling the case.  A, as we said, is a certain

5    date.  The other provisions, for example -- do

6    you have a copy?

7                    THE COURT:  Yes, I do.

8                    MR. FLEMING:  Okay.  So if I look

9    at 1.2(b), it's a commercial sale by a third

10   party other than the first filers, Par and --

11                   THE COURT:  By the way, in that

12   thing does generic equivalent, does that

13   essentially just mean generic?

14                   MR. FLEMING:  No, it's generic

15   equivalent to Colcrys, the ANDA that was the

16   subject of the litigation.

17                   THE COURT:  Okay.  But in other

18   words, a generic equivalent doesn't include

19   Mitigare, right?

20                   MR. FLEMING:  That's exactly

21   right, Mitigare is not a generic equivalent.

22                   THE COURT:  Okay.  All right.

23                   MR. FLEMING:  It's a brand product

24   and not AB rated to Colcrys.  The important part

```
 1      of B is on the second to last line is that it's
 2      permitted and authorized.  And so what is this
 3      doing?  This is if Takeda were to give a license
 4      or permit another generic to go, then Mylan,
 5      they should get to go within, you know, certain
 6      amount of time.  You know, again, the market
 7      changed.  Something entered the market.  A new
 8      generic Colcrys product.
 9                  THE COURT:  There was some talk in
10      the briefing, which I didn't follow up on, about
11      most favored nation clause.
12                  MR. FLEMING:  Yes.  Let me address
13      that.
14                  THE COURT:  Okay.
15                  MR. FLEMING:  That's section 1.5
16      on page 5 of the agreement.  And this is very
17      important, Your Honor, because the most favored
18      nation -- and again, looking within the four
19      corners of the license agreement, this talks
20      about whether Takeda could give a license or
21      permission -- it's three lines up from the
22      bottom of the page -- a license or permission to
23      a generic equivalent product.  Again, so if
24      Takeda were to give a license to another generic
```

```
 1    and put that generic out on the market, that may
 2    be a triggering event.  The most favored nation
 3    clause says that Takeda can't give a better deal
 4    to somebody than they gave to Mylan.
 5              THE COURT:  Well, I guess that's
 6    what I was wondering about, the most favored
 7    nation clause is -- doesn't that mean that if in
 8    terms of 1.2(c) -- I'm sorry, 1.2(b), wouldn't
 9    that mean that Takeda has breached the most
10    favored nation clause if you're permitted to
11    authorize some other generic other than the ones
12    that are accepted?
13              MR. FLEMING:  I'm not sure it's a
14    breach.  It's provided in the agreement that if
15    we were to give permission to another generic to
16    go, that would then mean that Mylan would get
17    the same benefit.
18              THE COURT:  Okay.  Because that's
19    not time delayed?
20              MR. FLEMING:  Right.
21              THE COURT:  So in other words,
22    they'd be treated equal?
23              MR. FLEMING:  This is actually an
24    interesting point about the MFN.  They talked
```

51

1     about the Hikma case and they're trying to read

2     that summary judgment as being the triggering

3     event.  Let me give you this proposal.  What if

4     Takeda had settled the Hikma case and gave Hikma

5     a royalty free license that they could go day

6     one, any day they wanted?  That license is not

7     covered by 1.5 because Mitigare is not a generic

8     product.

9                    THE COURT:  Right.  I think --

10                   MR. FLEMING:  So Mylan, there was

11    no -- our position is that Hikma and Mitigare

12    were not part of this agreement at all.  So how

13    can a situation where Takeda gives a license to

14    a party, Mitigare, Hikma, they go and that

15    license would not trigger.  There's no 1.2

16    paragraph that would trigger that event.

17                   THE COURT:  Okay.

18                   MR. FLEMING:  And I think that

19    ties into the idea that Mitigare was launched

20    before being sold, is sold today.  Mitigare has

21    been out there.  Mitigare, the sale of Mitigare

22    did not change anything.  It wasn't a change to

23    the status quo that would kick in a 1.2

24    accelerator.  It's not a Colcrys ANDA product.

```
 1                  THE COURT:  Yeah.  That seems --
 2      it's not an ANDA, certainly not based on ANDA,
 3      so it's probably not an ANDA product.  All
 4      right.  So I think I -- I think I understand
 5      1.2(c).  And are 1.2(e) -- and 1.2(e) is just
 6      kind of a more complicated version of 1.2(c),
 7      isn't it?
 8                  MR. FLEMING:  Sorry?
 9                  THE COURT:  I mean, it's not
10      exactly the same, but it's the same kind of
11      general idea is something happens and then Mylan
12      can launch?
13                  MR. FLEMING:  Well, 1.2(c) is,
14      again, has a certain time period, but again what
15      it does is it gives preference to Par, Watson
16      and Amneal.
17                  THE COURT:  I understand they're
18      not exactly the same.  But the idea is that
19      they're both kind of here's something that could
20      happen in the generic world that it would give
21      Mylan the right to launch if the thing happened.
22                  MR. FLEMING:  That's exactly
23      right.  Something is happening in the generic
24      world.  That's what we're saying 1.2 is all
```

```
 1      about.  It's the title, generic entry dates.

 2      It's in the description.  It refers to Mylan

 3      selling their ANDA product.  Something happening

 4      in the generic world.  Mitigare, the Hikma

 5      decision is not part of that generic world.

 6      Mitigare is a brand.

 7                  THE COURT:  Yeah.  Even though I

 8      take it -- so, you know, (b) and (e) talk about,

 9      they have the word generic in there somewhere.

10      Seeing these particular companies, so we know

11      what it's talking about.  (D) doesn't have the

12      word generic in there anywhere, does it.

13                  MR. FLEMING:  Correct.

14                  THE COURT:  And (f), which I

15      haven't studied, but that seems to have the word

16      generic in it too, right?

17                  MR. FLEMING:  (F) goes to whether,

18      you know, you either grant or don't grant the

19      preliminary injunction and how that effects all

20      the other generics, yes.

21                  THE COURT:  Okay.  So that's -- I

22      mean, do you make anything -- I mean, is there a

23      reason why -- why doesn't 1.2(d) refer to

24      generic if it's limited to generics.
```

54

```
 1              MR. FLEMING:  I think the intent
 2    of the parties, which I think you have to
 3    consider, was that this entire agreement is for
 4    the ANDAs and Colcrys ANDAs.  The only thing I
 5    can say is that (d), like the other paragraphs
 6    in 1.2, does have the same time period, that's
 7    number of days.  And that's the same giving
 8    preference to the earlier first, which are Par,
 9    Amneal and Watson, which are generic products.
10    I can't put a word in that's not there.  So you
11    are correct, a word is not there.  I think it
12    was clearly meant that it was to be for ANDA
13    applications.  And I think when we talk about
14    asserted and adjudicated and we talk about how
15    that applies to Hatch Waxman, I think that again
16    shows the intent of the parties that asserted
17    and adjudicated meant that the parties were at
18    the time of negotiating putting this in as ANDA
19    related.  And it's a triggering event for
20    Mylan's ANDA product.
21              THE COURT:  Okay.  What else do
22    you got there, Mr. Fleming?
23              MR. FLEMING:  Turning to slide 13.
24              THE COURT:  We're going to need to
```

```
 1        pick up the pace.
 2                    MR. FLEMING:  Okay.  If you ever
 3        wanted to go back and look, you asked before
 4        whether the original five and the three that
 5        were added, were those the three that were
 6        ultimately decided, if you compare the numbers,
 7        the ones on the far right, one comes from the
 8        original five and two come from the three that
 9        were added.  Okay.  Turning to slide 14, and I
10        will pick up the pace.  I think both parties
11        agree --
12                    THE COURT:  Yeah, yeah.  Let's
13        skip that.  I think I've got that.
14                    MR. FLEMING:  Okay.  I think slide
15        15 is an important one because if you look at
16        the language of 1.2(d) on the left-hand side and
17        again, I want to focus on all in the patents
18        that were asserted and adjudicated, it's
19        interesting how Mylan has tried to rewrite 1.2
20        to get it down to just three patents.  Instead
21        of just saying asserted, they, in our first
22        letter back in October they described the two --
23        three patents and the then asserted.  Then in
24        the subsequent briefing that's gone on before
```

1      Your Honor, they put in continued to assert,

2      ultimately asserted, ultimately chose to assert,

3      continue to assert.  In our view they're trying

4      to rewrite 1.2 to get it to the three patents.

5      And if you look at slide 16, for example --

6             THE COURT:  I got the idea.  Let's

7      skip ahead to like slide 19.  That seems to be

8      the same thing.  A lot of slides here that

9      repeat themselves.

10            MR. FLEMING:  Slide 18 for a

11     second.  I mean, I think slide 18, it's telling,

12     because in their attempt to track the language

13     of 1.2, which we say they don't meet, they've

14     got the all, they make it bold, but then they

15     have to say ultimately chose to assert.

16           THE COURT:  Mr. Fleming, I'm not

17     really very impressed by relying on how they

18     describe things in their brief as some evidence

19     of how I should interpret the contract.  I mean,

20     you know, they're briefs.  I just don't think it

21     matters what exactly they say in the briefs in

22     terms of, you know, it's not like rule 11 as to

23     what it means in the contract.

24           THE COURT:  Okay.  Slide 19, where

```
1       you want to go, slide 19, this kind of
2       summarizes our interpretation of 1.2(d).  We
3       believe it means that all claims asserted must
4       be adjudicated to a decision holding either one,
5       not infringed or two, any combination of not
6       infringed and invalid.  And for at least three
7       reasons the West-Ward litigation doesn't mean
8       that.  Takeda asserted only 8 patents, but only
9       three of the asserted patents were found not
10      infringed.
11              THE COURT:  And just to be clear,
12      because I think you've said this already once,
13      but if it were the case that there was some
14      generic that you had to sue in an ANDA and you
15      had asserted the 8 patents against them, and
16      then when I leaned on you, you dropped five of
17      them and went to trial one three of them and you
18      lost, you'd say no effect, right, because you
19      dropped five of them along the way?
20              MR. FLEMING:  Hard to say no
21      effect.
22              THE COURT:  Well, you'd say it
23      doesn't the trigger the provision.
24              MR. FLEMING:  I think you asked me
```

```
 1        what happens in a court in a trial --
 2                    THE COURT:  No, no, no.  Mr.
 3        Fleming, before we get to trial, through some
 4        combination of charm or pressure I get you to
 5        drop five of them so we only go to trial to
 6        three of them, does that mean that no matter
 7        what I do at the trial on three, I can say these
 8        are the worst patents in history and they're not
 9        infringed to boot and it has no impact -- it
10        doesn't trigger 1.2(d)?
11                    MR. FLEMING:  I think -- I guess
12        I'm not really sure how to answer that, because
13        I'm not sure in the sense that I think 1.2(d)
14        required that you both -- that the patents that
15        were asserted are adjudicated.  And to the
16        extent 8 were asserted, only three were
17        adjudicated.
18                    THE COURT:  And by adjudicated,
19        you mean judge rules infringed, invalid, not
20        infringed, not invalid, something like that?
21        You don't mean we agree to dismiss it with
22        prejudice?
23                    MR. FLEMING:  I think that under
24        the rules that apply to this ANDA for Mylan,
```

```
 1        that would not work.  And I'll give you another
 2        example.  So for example, if you settled a case
 3        and dropped patents in settlement, which is sort
 4        of what you're asking or making reference to,
 5        under the Hatch Waxman generics don't want just
 6        a dismissal with prejudice, they want a
 7        dismissal finding nobody infringes.  And finding
 8        invalidity.  The generic brand would need to
 9        agree to language that all claims are dismissed
10        and -- or found not infringed, invalid and
11        unenforceable.  Yes, the generic would need that
12        language, all asserted and adjudicated to get
13        out from underneath the, for example, a 30-month
14        stay.
15                    THE COURT:  And I take it in
16        Hikma, because I granted summary judgment, I
17        don't know, was there a final judgment after
18        that?
19                    MR. FLEMING:  There was a final
20        decision.
21                    THE COURT:  And I take it whatever
22        that said -- what did it say about the five
23        patents that had been dropped?
24                    MR. FLEMING:  Nothing.  The
```

```
1    patents were voluntarily dismissed, i.e., they
2    were never adjudicated.  Maybe there's a claim
3    preclusion.  There is no issue preclusion with
4    respect to claims of those patents.  They're out
5    there.
6                    THE COURT:  Okay.
7                    MR. FLEMING:  And if Mitigare was
8    a generic product and if it was within the
9    30-month stay, Mitigare would not have gotten to
10   go.
11                   THE COURT:  Right.  If it was
12   within the 30-month stay.
13                   MR. FLEMING:  Correct.
14                   THE COURT:  Okay.  All right.
15                   MR. FLEMING:  And I'm just going
16   maybe slide 20, again, this is where -- I've
17   already talked about the 30-month stay.
18   Actually slide 21 goes to the point that Hikma,
19   the maker of Mitigare, they dismissed their
20   affirmative defenses of non-infringement,
21   invalid or enforceability for those five
22   patents.  There was no adjudication on those
23   five patents.
24                   THE COURT:  Okay.  I got that.
```

61

```
 1                    MR. FLEMING:  Okay.  Let's turn to
 2         slide 25, please.  And you asked me some
 3         questions whether the -- about whether things
 4         were either extrinsic evidence or parole
 5         evidence with respect to what the license
 6         agreement, how you can read it.
 7                    THE COURT:  Sure.
 8                    MR. FLEMING:  And what we set
 9         forth on this slide is ditch portions within the
10         license agreement which we believe helps
11         demonstrate that the agreement was directed to
12         Colcrys ANDA products.  And you start with the
13         whereas clauses and they talk about tablets.
14         Colcrys is a tablet.  The generic has to be a
15         tablet to be AB rated.  Mitigare capsule not AB
16         rated, so different products.  Also in the
17         whereas clauses, the purpose of the license
18         agreement was an opportunity for pro competitive
19         generic competition, for Colcrys.  Mitigare is
20         not a generic to Colcrys.  We've already talked
21         about the entry dates.  We've talked about the
22         most favored nation and then the licensed
23         patents that also talks and makes reference to
24         ANDA.
```

```
 1              I think slide 26 I can just give

 2     half a second to.  I think Your Honor is aware

 3     and it was in the briefs that the agreement does

 4     provide that the patents are valid, enforceable

 5     and infringed.  So I don't think there's a

 6     dispute about that.  I think Mylan's only

 7     defense is they say there was no breach.  But if

 8     there was a breach, I think we're clear on that

 9     and so I don't think we have to spend any time

10     on 27.  We can skip 28 and let's turn to 29,

11     which is the irreparable harm.

12              THE COURT:  Yep.

13              MR. FLEMING:  Irreparable harm.

14     We have a license agreement here between Takeda

15     and Mylan where Takeda has agreed that a breach

16     of section 1.2 or 1.4 is irreparable harm.  It's

17     in the agreement.  And we do cite the TP Group

18     case, which is one of your cases, that's the

19     contractual stipulation as to irreparable harm

20     alone suffices to establish that that element,

21     for purposes of issuing an injunction.  But if

22     you look at the next slide, slide 30, the actual

23     agreement on irreparable harm, which is the

24     section, portion highlighted, Mylan acknowledges
```

1    that marketing the Mylan ANDA product in breach

2    of paragraph 1.2 of the license agreement would

3    cause Takeda irreparable harm.  We believe that

4    to be admission.  But even more important, I

5    think, is the language above that, Your Honor,

6    where the parties, Mylan and Takeda agreed that

7    Takeda would be entitled to immediate injunctive

8    relief.  That goes beyond even just admitting

9    irreparable harm.  So if one was to consider the

10   agreement on irreparable harm to be a factor to

11   be considered, I think the fact that the parties

12   actually stated and made an affirmative

13   statement that Takeda would be entitled to

14   immediate injunctive relief, it almost creates

15   an estopple.  They've agreed to that and here we

16   are.  So to the extent, I think this factor goes

17   in our favor.

18              THE COURT:  Yeah, you make a point

19   there.  Let me think about this for a second.

20   So is the way that you would look at this is if

21   I think there's a likelihood of success on the

22   merits, then it follows that I think there is a

23   likelihood of irreparable harm because of this

24   paragraph?

```
1                    MR. FLEMING:  I think this

2       paragraph on its own states that there is

3       irreparable harm and I also think --

4                    THE COURT:  But the paragraph on

5       its own says the breach would be irreparable

6       harm.  If it's not being breached, then there's

7       no irreparable harm, right?

8                    MR. FLEMING:  If there's no

9       breach, correct.

10                   THE COURT:  So I'm just thinking

11      about it, and, you know, normally you look at

12      irreparable harm as kind of an independent

13      determination from whether there's a likelihood

14      of success on the merits.  But here if you're

15      relying on this paragraph for the irreparable

16      harm, then you probably have to have a fairly --

17      it would seem to me that it's kind of -- it's

18      just combining the two separate things that are

19      normally separate into one and making it an all

20      or nothing on the basis of whether or not I

21      think there's a likelihood of success.

22                   MR. FLEMING:  I can see why you

23      come to that conclusion.  That's why I got

24      another slide that follows that.
```

```
 1                    THE COURT:  Okay.

 2                    MR. FLEMING:  But I see your

 3     point.  Your point is, as I understand it, that

 4     if there was no breach, then they're not

 5     admitting to anything and they didn't admit that

 6     there was any irreparable harm.  To the extent

 7     you're being asked to determine the likelihood

 8     of success on that point, I guess if it's a

 9     close call, for example, and you can understand

10     my interpretation of were asserted to mean 8

11     patents and that adjudicated were only three

12     patents, and you also understand -- it's three

13     and three, and it's a close call, I think that

14     this does become a factor because there is going

15     to be and there has been a launch of Mylan's

16     ANDA product.  So the fact that they have

17     launched means that they have done something,

18     they have put a product out there and so that

19     fact, I think, gets you beyond, you know, just

20     the breaching, so I think there has been

21     irreparable harm.

22                    THE COURT:  Let me ask you a

23     slightly different question that's perhaps not

24     relevant to anything, but maybe it is.  I take
```

```
1     it does the most favored nation clause prevent

2     you from having made -- does it prevent Takeda

3     from having made deals with the other generics

4     who are not Par and Watson and Amneal, that they

5     would have the same generic entry date as the

6     default?

7                 MR. FLEMING:  Actually that's an

8     interesting point.  And I'm sorry, I missed the

9     beginning of your question, but if you're asking

10    the most favored nation is, hypothetically if

11    there is a most favored nations clause, what

12    that means is that the substance of agreements

13    cannot give a better deal.

14                THE COURT:  But it can give you

15    the same deal?

16                MR. FLEMING:  It can give you the

17    same deal, which is an interesting question in

18    the sense that we don't see any other generics

19    launching.  That Hikma decision was back --

20                THE COURT:  Well, I mean, I don't

21    think that's an argument really -- I mean, for

22    one thing, Mylan doesn't know what any other

23    generic agreed to, right?

24                MR. FLEMING:  Correct.
```

```
 1                    THE COURT:  Yeah, yeah, yeah, they
 2        could make some educational guesses, but these
 3        are all highly confidential agreements so
 4        whatever -- secret, not secret from your side,
 5        but a secret from their side.
 6                    MR. FLEMING:  Disagree a little
 7        bit.  That most favored nation clause they have,
 8        that tells you that if there are other generic
 9        entry things, they've got to be at least the
10        same.
11                    THE COURT:  This can't be better?
12                    MR. FLEMING:  Correct.
13                    THE COURT:  Yeah, yeah, I got
14        that.
15                    MR. FLEMING:  Slide 31, we've
16        already spoken to this, but we believe these to
17        be additional irreparable harm.  I just heard
18        what you said about the market and that Mylan
19        can pay whatever the damages are and how much is
20        sold, et cetera, but I think there is harm that
21        you can't put a price tag on.  And to the
22        extent, as we just discussed, Takeda has settled
23        with 10 other generics, their actions have the
24        potential to open the door for all of them at
```

1     different times, some faster than others.

2                    THE COURT:  But presumably the

3     default date would open the door just down the

4     road, right?

5                    MR. FLEMING:  The default date

6     does open the door, yes, to generic.  That's

7     part of settling the cases, that there is a date

8     certain that there will be full generic

9     competition for this product.  The agreement,

10    though, does provide that Par, Amneal and Watson

11    get a better deal.  They're first filers.

12    What's happening here is Mylan is trying to jump

13    ahead.  They're using almost like a gotcha, that

14    this Hikma decision somehow puts them ahead of

15    Par, Amneal and Watson.

16                    THE COURT:  Or maybe they're not

17    so much saying it puts them ahead, but they're

18    the first one to realize they can take advantage

19    of it, right?  Maybe they've got some clever

20    lawyers.

21                    MR. FLEMING:  Okay.  Mr. Sommers

22    might like that when he gets here, but that

23    could be one way to interpret it, yes.

24                    THE COURT:  All right.  Is there

1   anything else there, Mr. Fleming.  I think I've

2   given you plenty of time here, and I am

3   interested in having this finish before lunch,

4   so why don't I hear from the opposition.

5              MR. FLEMING:  Yes, Your Honor.

6              THE COURT:  All right.  So you are

7   Mr. Sommer?

8              MR. SOMMER:  I am, Judge.  Nice to

9   appear before you.

10              THE COURT:  You look kind of

11   familiar, but I can't place you as someone I've

12   actually had before me before.  Is this the

13   first time?

14              MR. SOMMER:  It is the first time,

15   Your Honor, although I was trying to figure out

16   if our mutual 10 years at our respective U.S.

17   Attorney's Office may have brought us in

18   contact, but I couldn't think of a time either

19   because I will admit when I looked you up, you

20   looked familiar to me as well.

21              THE COURT:  That's because we're

22   generic.

23              MR. SOMMER:  Judge, just to give

24   you a sense, my argument subject to your

```
 1        questions will take about 20 minutes.  I hope my
 2        estimate will be better than Mr. Fleming's.  To
 3        answer one of your questions, this is a question
 4        of law and that's because the language in the
 5        contract is clear and unambiguous.  The license
 6        agreement at issue in this case grants to Mylan
 7        the right to market and sell its generic
 8        Colchicine product as of a specific date, using
 9        our little code sheet, that's letter B, or at an
10        earlier date if any of certain events or
11        circumstances occur.  And one such circumstance,
12        as the Court well knows from all the briefs you
13        received, is set forth in section 1.2(d) of the
14        license agreement which expressly permits Mylan
15        to market and sell its generic product a
16        specified number of days after the language you
17        have seen and had read to you several times.
18        And as Your Honor also knows, in December 2018
19        this court granted summary judgment to Hikma in
20        the West-Ward case, holding that Hikma did not
21        infringe the three and only three licensed
22        patents that were both asserted and adjudicated
23        in that litigation.  Now, to be clear, as you've
24        heard, there were five others that were asserted
```

```
 1    earlier in that litigation, but before briefing
 2    was completed, and again, it may have been Your
 3    Honor's persuasive suggestions, but before
 4    briefing was completed on Hikma's summary
 5    judgment motion, Takeda voluntarily dismissed
 6    with prejudice its claims as to five of those
 7    patents.
 8              THE COURT:  Yeah, you know, my
 9    memory is a little hazy on that, but I think
10    what the federal circuit had held pretty much
11    indicated that those five patents, that there
12    was some reason why they couldn't really be
13    asserted any more in good faith.  Wasn't just
14    they wanted to make my life easier.
15              MR. SOMMER:  Maybe the federal
16    circuit was more persuasive in that regard.
17              THE COURT:  They can be pretty
18    persuasive.
19              MR. SOMMER:  Yes.  In any event,
20    as I noted, Your Honor then did adjudicate those
21    three patents and held that as to the only three
22    license patents that were both asserted and
23    adjudicated, that Hikma had not infringed those
24    patents.  That's the relevant background here.
```

1    There was an agreement negotiated between Takeda

2    and Mylan, two sophisticated parties with able

3    counsel containing clear and unambiguous

4    language.  And that language expressly permits

5    Mylan to launch based on the Hikma litigation.

6    Your decision was in December 2018.  Takeda did

7    not appeal.  Became a final decision.  After the

8    required time period passed, Mylan provided

9    notice to Takeda that it was going to launch.

10            THE COURT:  And so December of

11    2018 decision, the required time was probably 30

12    days because there was no notice of appeal,

13    right?

14            MR. SOMMER:  Right.

15            THE COURT:  So that's late January

16    or sometime in January of 2019?

17            MR. SOMMER:  There's no dispute on

18    the number of days having run.

19            THE COURT:  No, no.  But my point

20    really was the days ran and then some.

21            MR. SOMMER:  Yes.

22            THE COURT:  And was Mylan's

23    eventual entry, was that limited by when the FDA

24    approved it.

```
1              MR. SOMMER:  That was certainly

2       one aspect.  There were certainly unrelated

3       aspects to this litigation, but Mylan certainly

4       made sure it waited the allotted period of time

5       and had FDA approval before its launch.

6              THE COURT:  Okay.

7              MR. SOMMER:  So here we are judge

8       on a motion for preliminary injunction brought

9       by Takeda in which Takeda is arguing that it

10      really didn't intend to give Mylan this right to

11      launch and where Takeda is arguing that you

12      should rewrite the contract to deprive Mylan of

13      an express contractual right and prevent Mylan

14      from providing the market with a lower cost

15      Colchicine product.  And of course for them to

16      prevail, Judge, as you well know, they first and

17      foremost must establish a likelihood of success

18      on the merits.  And that means in this case that

19      they must establish that the contract doesn't

20      sat what it clearly does say.

21              THE COURT:  So on that subject, is

22      there any place in the license agreement where

23      there's any reference to either Mitigare or to

24      any NDA of someone other than Takeda?
```

74

1           MR. SOMMER:  I don't believe so,

2      Your Honor, but if I may hand up one

3      demonstrative because I think it goes directly

4      on that point.

5                THE COURT:  Sure.

6                MR. SOMMER:  I've marked this as

7      Mylan exhibit 2.  And this really picks up.  I

8      do want to -- I do want to address asserted and

9      adjudicated, but let me jump to this because it

10     really was a focus of much of your questioning

11     to Mr. Fleming.  What I've put on this

12     screenshot, Your Honor, are the relevant

13     sections of section 1.2.

14               THE COURT:  Yes.

15               MR. SOMMER:  And Your Honor, I

16     mean, you really took some of my best material

17     in your questions, but as you'll already

18     observe, 1.2(b) has the words generic equivalent

19     and that's defined in exhibit A as an AB rated

20     equivalent.  1.2(e) has the authorized generic

21     language, same.  1.2(f) has the same language,

22     generic equivalent, but there are other sections

23     and Takeda's counsel studiously avoided 1.2(g),

24     for example.  It's not like the parties somehow

```
 1        forgot to put generic equivalent in 1.2(d).
 2        It's also not in 1.2(g).  And why?  Because
 3        1.2(d) and 1.2(g) are litigation-based triggers.
 4        They're about the patents.  They're patent
 5        centric is probably the best way to describe it.
 6        Whereas 1.2(b), (e) and (f) are product centric.
 7        It is not nonsensical and unreasonable to
 8        believe that these two sophisticated parties
 9        didn't understand what they were writing in the
10        contract.  If 1.2(d) was supposed to be limited
11        to an ANDA, as Mr. Fleming keeps urging Your
12        Honor to somehow draft onto the contract, it
13        simply would have said that.  And it's not an
14        isolated event, judge, which is why I thought it
15        was important to put before you 1.2(g), which
16        Mr. Fleming never mentioned.  And that's why,
17        Judge, I come back to the point of contract
18        interpretation, because both parties here agree
19        that the language is clear and unambiguous.
20        What is the starting point for the Court.  Well,
21        the Delaware courts make that clear, you are
22        constrained by a combination of the parties'
23        words and the plain meaning of those words and
24        the launching point is the four corners of the
```

1    contract.  And here, and this is a quote, when

2    two sophisticated parties bargain at arm's

3    length and enter into a contract, closed quote,

4    as is certainly the case here, quote, the

5    presumption is even stronger that the contract's

6    language should guide the court's

7    interpretation.  That's the JFD Steel Work case,

8    this district, from 2011.  So look, we can all

9    read the words.

10             So where do we diverge here?

11    Well, Takeda takes the position that the patents

12    originally asserted in the Hikma action, but

13    then voluntarily dismissed, somehow remained

14    asserted.  And as we explained in our opposition

15    brief, this is nonsensical.  While they may have

16    at one point asserted eight license patents,

17    immediately upon the filing of their stipulation

18    of dismissal, which was their own choice, maybe

19    influenced by the federal circuit, its claims

20    with respect to five of those patents were no

21    longer asserted.  That's precisely what a

22    stipulation of a voluntary dismissal is by a

23    plaintiff, it's a decision by the plaintiff to

24    abandon asserted claims to make claims that were

1     ones asserted no longer asserted.  And as a

2     result there were only three claims that were

3     asserted that required adjudication.  And I

4     should add, Your Honor, you brought it up in

5     your summary judgment decision.  You recognized

6     this.  You wrote about the Takeda had asserted

7     eight patents, but then quote, Takeda

8     voluntarily dismissed its infringement claims

9     with respect to five, quote, thus only three

10    patents remain at issue.

11              THE COURT:  You know, it's coming

12    back to me.  I think the way it went, because I

13    could be wrong about this, but Hikma filed in

14    its opening brief there was all eight of them.

15    Only when Takeda responded they said oh, by the

16    way, we're dropping five of them.  I think it

17    was -- not that I think it makes any particular

18    difference for here, but I think it was, you

19    know, it was just un-defensible to keep going

20    forward with those five.

21              MR. SOMMER:  And that may very

22    well be, Judge, and I agree with you it doesn't

23    make a difference here.  Because again, we get

24    to the word adjudicated.  Our position is look,

```
 1    those eight asserted, the five are no longer

 2    asserted.

 3              THE COURT:  So one of the

 4    questions -- one of the things that the

 5    plaintiff wrote in its brief that I'm interested

 6    in your response to is they said asserted and

 7    adjudicated makes the asserted essentially

 8    meaningless because whether it gets adjudicated

 9    or things are asserted.

10              MR. SOMMER:  I actually scribbled

11    in my notes while I was listening another

12    instance where you actually anticipated my

13    argument.  The word asserted, you put your

14    finger right on it.  It's against third parties.

15    It's against third parties.  Takeda is in

16    control of the claims it asserts against third

17    parties in litigations.  The language of section

18    1.2(d) is limited to situations where Takeda

19    chooses to put its licensed patents at issue by

20    asserting claims with respect to them.  It chose

21    to sue Hikma.  It chose to assert the license

22    patents.  It didn't need to, but it elected to

23    do so.  And why?  All of these slides, trying to

24    argue that Mitigare and Colcrys are different.
```

1    I'm going to avoid using the wrong adjective.

2    It's nonsense, Judge.  And the reason is first,

3    they're both .6 milligram Colchicine products.

4    They both cover some of the same things.  Yes,

5    one is a capsule, one is a tablet, but what

6    speaks the most about it is what Takeda did.  As

7    soon as there was this threat of Mitigare,

8    Takeda took action.  It filed its action.  It

9    pursued that for two years.  And Judge, in its

10   own brief in that case, in support of its

11   preliminary injunction, Takeda argued, quote,

12   Hikma's release of a Colchicine products,

13   Mitigare, thus would have a devastating and

14   permanent effect on Takeda sales of Colcrys.

15   For them to stand here now today after having

16   argued how they're essentially the identical

17   drug and Mitigare was this incredibly giant

18   competitor to Colcrys, I think is a little

19   insincere.

20                THE COURT:  Yeah.  Well, you know,

21   you know, I don't think, you know.  Great

22   respect to Mr. Fleming, so I don't think it's

23   being insincere here, but as a party Takeda has

24   already been to this court once saying the sky

```
 1      is falling and turned out it wasn't.  And then

 2      when I do the damages, you know, then their

 3      position was nothing to see here, this was a

 4      minor blip.  So, you know, I don't think they're

 5      the only pharmaceutical company in the history

 6      to do 180 on a position when it suited their

 7      purposes, but it does -- its something that I

 8      can't put out of my head.

 9              MR. SOMMER:  Judge, let me turn to

10      the next reason why they have no likelihood of

11      success on the merits.  And that's the word

12      adjudicated, because what the contract makes

13      clear hear, the relevant provision is, quote, a

14      final court decision, holding that, all claims

15      to the license patents that were asserted and

16      adjudicated against the third party are not

17      infringed or a combination.  Now, in their

18      opening brief they actually tried to mount an

19      argument that all eight were adjudicated.  I'm

20      sure you picked that up.  They were saying, oh,

21      yeah, it is adjudicated, it might be claim

22      preclusion but not issue preclusion, but they're

23      all adjudicated.  We explained in our opposition

24      brief that was certainly wrong.  I'm not going
```

```
 1        to --
 2                    THE COURT:  Well, but I think Mr.
 3        Fleming has a point or he might have a point, I
 4        don't know, because I haven't researched it,
 5        that adjudicated, you know, the FDA or the ANDA
 6        statute, somewhere in there, they have or they
 7        either do or have had some strange rules about
 8        things so that what might be considered to be
 9        adjudicated for one purpose might be different
10        for a different purpose.
11                    MR. SOMMER:  That may be, but it's
12        not an issue any more before you because in
13        their reply brief they did what you just
14        described as a 180 and now their position is it
15        wasn't adjudicated.  That's their position on
16        reply and certainly Mr. Fleming's position in
17        his argument to Your Honor this morning.  They
18        are now arguing that the way you should
19        interpret the language is that whenever claims
20        are asserted must have been adjudicated.  That's
21        now their formulation, because their whole
22        argument is well, there were eight so -- but
23        only three were adjudicated, so the trigger does
24        not get implicated.  That's not the language in
```

1    the agreement.  The language is asserted and

2    adjudicated.  So the language was a total change

3    in position.

4               THE COURT:  And I'm sorry, what

5    was the answer to the question of whether

6    asserted is a necessary word, you know, when I

7    asked that, you then went into 1.2(d) and

8    1.2(g), but the argument that it's surplusage,

9    what's the response?

10               MR. SOMMER:  I made the same

11    point, Your Honor, under the language of 1.2(d),

12    it's within Takeda's control whether they assert

13    the patents.  So if you look at 1.2(d) --

14               THE COURT:  But I can't adjudicate

15    for patents whose claims are not asserted,

16    right?

17               MR. SOMMER:  That was my example

18    in my outline.  It's a declaratory judgment

19    brought by another party, that's not a claim

20    asserted by Takeda.  And Mr. Fleming actually

21    agreed with Your Honor, so that formulation of

22    language actually gives Takeda the power to

23    decide for itself whether to assert claims or

24    not, so it doesn't make it surplusage.  It

```
1       actually has significant meaning for Takeda.  It

2       can protect its patents by not asserting the

3       claim if it so chooses.  That's its right, but

4       it doesn't change the clear and unambiguous

5       language of what is there.  And again, I don't

6       want to beat the dead horse of sophisticated

7       parties, but as you saw from the document I

8       handed up, the sophisticated parties here agreed

9       to a particular way of describing the triggers.

10      And here, 1.2(d) has nothing to do with some

11      product, some drug.  It's based on a patent

12      centric result.  What happened with the patents

13      that were asserted and adjudicated.  So where

14      does that leave them?  It leaves them with

15      argument --

16                 THE COURT:  Just, Mr. Sommer, just

17      to play out what I think you're saying here.

18      Dividing it into product triggers and licensed

19      patent triggers, the way this would be sort of

20      connected together is in some ways protecting

21      Mylan's interests if there's some generic

22      version that's launched ahead of schedule so to

23      speak or through some way and then Mylan would

24      have the delay, but they get to launch because
```

1      the other company launching is going to cause

2      them to lose sales sooner or later.  And in

3      other words with the licenses, it's kind of --

4      if the licensed patents aren't good enough to

5      keep out competitors because they're adjudicated

6      against Takeda, then, then Mylan ought to get to

7      rush in because everyone else is going to be

8      able to rush in too if the patents can't protect

9      the product.

10                 MR. SOMMER:  Well, I can't speak

11     to what others would have the right to do

12     because we have not seen those contracts nor

13     have they been presented to this court, which is

14     why I keep hearing about them and then in the

15     next breath they're not relying on extrinsic

16     evidence, I can't really reconcile the two.  But

17     certainly the contract Mylan negotiated with

18     Takeda does allow Mylan to launch in that

19     circumstance, where the license patents that

20     were asserted and adjudicated are found to be

21     non-infringing or the combination.

22                 And Judge, just one last thing on

23     this.  Who says we get put ahead?  No one says

24     we get put ahead.  There's a number of days we

```
 1        have to wait there.  And whose to say that what
 2        they call the earlier filers don't have the
 3        right to immediately enter and still get ahead
 4        of us for that fixed number of days?  Now, I
 5        could be accused of speculating here, I think
 6        it's common sense, but certainly Takeda, the
 7        movant on this motion who bears the burden of
 8        proof, has not come forward with those license
 9        agreements to show that there's any scenario
10        under which Myland gets ahead of the earlier
11        filers.  There's no record on that at all.  And
12        I think I can use common sense and go, I bet, I
13        bet those don't have that period of time they
14        have to wait.  And that keeps us behind the
15        earlier filers.  So there's no record that
16        supports this idea that we're jumping.
17                    THE COURT:  You say it keeps you
18        behind, and yet you've launched and they
19        haven't.
20                    MR. SOMMER:  Maybe you're right.
21        Maybe we do have smarter lawyers.  I don't take
22        credit, but the other lawyers at my table are
23        very smart.  Look, I don't know what their
24        contracts say.  Maybe the 1.2(d) in some of the
```

```
 1          other license agreements say authorized generic.

 2          I don't know.  We negotiated a contract.  We

 3          have rights under the contract.  And where do

 4          they end up once you look at the plain meeting

 5          of asserted and adjudicated?  It's all the

 6          balance of their arguments basically saying

 7          well, that wasn't our intent, which is code for,

 8          Judge, please rewrite the contract.  That is

 9          particularly inappropriate in a preliminary

10          injunction motion.

11                    THE COURT:  Well, so Mr. Sommer, I

12          would say -- I mean, one of the things that is

13          sort of -- I guess I would put it like this, and

14          I asked you to comment on it.  You know, you've

15          said the two parties here are sophisticated,

16          large pharmaceutical companies.  All these other

17          generics that are floating around are also and

18          the -- and from what's been said, I gather that

19          Mylan is a second filer, not a first filer, and

20          in terms of interpreting the contract, shouldn't

21          I be aware of sort of the surrounding business

22          model of this industry, which is, you know,

23          barring malpractice, the contracts are written

24          to -- so that the first filers get to go first
```

```
 1        and the second filers go after?

 2                   MR. SOMMER:  Right.  But you know,

 3        Judge, from the many cases you have had that the

 4        first filer doesn't necessarily go first.  Maybe

 5        they don't have FDA approval yet, maybe they're

 6        not ready from a manufacturing perspective.

 7        I've been involved in cases where the first

 8        filer didn't get to go first.  Now, I don't

 9        know.  Again, this is all extrinsic evidence.

10        It's not before the court.  But there certainly

11        are scenarios where that is a possibility.  And

12        again, as I'm saying here, there's nothing in

13        this license agreement that provides for Mylan

14        to go first that eliminates the possibility that

15        the earlier filers could go first if they had

16        product, if they had FDA approval.

17                   And so, you know, getting back to

18        really my final point here, which is in several

19        parts, I don't want to mislead, Your Honor.

20        They're asking you to rewrite the contract.

21        They want you to inject words into 1.2(d) that

22        are not there.  And, you know, to his credit,

23        Mr. Fleming essentially acknowledged that.  He

24        stood before you and said, you asked the
```

```
 1        question, you know, you acknowledged that
 2        authorized generic, those words aren't there,
 3        and he goes yeah, they're not there.  And your
 4        follow up was, it's your argument that they
 5        should have been there.  And he sheepishly or
 6        reluctantly acknowledged that.  They shouldn't
 7        be there.  That's not the negotiation that was
 8        made and it's certainly not some kind of
 9        drafting error.  I don't know if that's what
10        they're arguing.  So the starting point, as I
11        mentioned before if you look at the words of the
12        contract, I've given you my demonstrative.  I
13        think it makes it clear what's really going on
14        here.  That's why their arguments about Mitigare
15        are so misplaced, because they're belied by the
16        plain language of section 1.2(d) which by itself
17        terms did not include the limiting language
18        Takeda now urges you to add.
19                    Let's see.  I made that argument
20        already.  Okay.  I briefly addressed the
21        similarity in the drug, so I don't need to go
22        into that.  So, you know, this reliance on
23        extrinsic evidence that you see throughout
24        Takeda's briefs about what Mylan was thinking,
```

```
1     what the parties intended, you know, it

2     shouldn't be considered by the Court,

3     particularly here where the language is so

4     clear.

5                 I want to address one thing about

6     this 30-month stay argument that I heard a

7     little bit about.  First of all, there was no

8     30-month stay in the Hikma case because it was

9     not a Hatch Waxman case.

10                THE COURT:  Right.

11                MR. SOMMER:  Let's take the

12    hypothetical they're trying to create that this

13    would make no sense if Mylan somehow is allowed

14    to launch but the litigating party is still

15    subject to a 30-month stay.  It's a red herring,

16    Judge.  Let me explain why.  Let's use Hikma as

17    an example, even though there was no 30-month

18    stay there.  What actually happened?  Takeda

19    dismisses as to five patents.  The remaining

20    three are adjudicated against them.  Under that

21    scenario, if that was a Hatch Waxman case, the

22    generic would be freed of the 30-month stay and

23    get to launch and under our license agreement so

24    would Mylan, so that's not their theoretical
```

1    concern, because both can launch.  Of course

2    Mylan would have to wait the prescribed number

3    of days.  Let's change the facts a bit.  Assume

4    that Takeda voluntarily dismisses all eight of

5    its patents.  I think you were actually moving

6    toward that question in your discussion with Mr.

7    Fleming.  Again, the 30-month stay would be

8    lifted as to the generic.  That's the effect of

9    them dismissing that litigation.  It's lifted.

10   In that situation, 1.2(d) is not triggered.

11   Mylan cannot launch because there was no

12   adjudication.  So this theory of theirs, how

13   could there be a scenario where Mylan gets to

14   launch but the litigating party doesn't.  It's

15   the null set.  There's no scenario where that

16   happens.  That actually confirms our

17   interpretation of the contract.

18             So, Judge, the bottom line is, I

19   know you understand our arguments because you

20   asked the questions that made that clear to me.

21   Takeda's argument that you should rewrite the

22   license agreement to add language that clearly

23   was not intended to be in 1.2(d) should be

24   rejected.  This section says what it says, it

```
1        says what the parties negotiated and agreed it
2        would say and that is that if Takeda claims that
3        are both asserted and adjudicated result in a
4        holding of non-infringement or combination of
5        non-infringement, invalidity or
6        unenforceability, Mylan is allowed to launch
7        after waiting the set number of days and that is
8        just what came to pass here.
9                       Let me very briefly address
10       irreparable harm, if I may.
11                      THE COURT:  Sure.
12                      MR. SOMMER:  Your Honor, if you
13       find Takeda has failed to carry its burden of
14       demonstrating a likelihood of success on the
15       merits, that's really the end of it.  I think
16       you're right.  I mean, they've hitched their
17       horse on the wagon of -- their irreparable harm
18       horse is hitched to the wagon of we have
19       supposedly breached.  And that, in the absence
20       of us breaching, there has been no showing of
21       irreparable harm by Takeda.  I mean, their only
22       argument is, look at section 110 of the
23       contract, which has the language.  We're not
24       running away from what the contract says.  I
```

```
 1        want to make that clear.  We stand by it, but --
 2                    THE COURT:  So if I think there is
 3        a likelihood of success that's been shown, does
 4        that mean then you agree irreparable harm?
 5                    MR. SOMMER:  Well, Judge, let me
 6        put it this way.  I'm not trying to avoid your
 7        question.  This court, in the Cabellas versus
 8        Hybee case and other courts in this district,
 9        have found that just because the parties
10        stipulate to irreparable harm doesn't divest the
11        Court of the discretion to make a finding.
12                    THE COURT:  Yeah, I don't want to
13        say something about Cabellas that's wrong, but
14        on the one hand you have multi-million dollar
15        corporation and on the other hand you have a
16        bunch of individuals, so it's not quite the same
17        thing.
18                    MR. SOMMER:  I didn't want to be
19        so presumptuous as to tell you the parties have
20        effectively tied your hands.  What I will say is
21        we stand by our contract, we stand by the clear
22        and unambiguous language in the contract.  All
23        I'm pointing out, Judge, is if we didn't breach,
24        there's been no showing of irreparable harm
```

```
 1        whatsoever.

 2                    And I want to just comment very

 3        briefly on slide 31, which Mr. Fleming put

 4        before you, I think to try to make the argument

 5        that even if you find there was no breach, they

 6        somehow have established irreparable harm

 7        separate and apart from section 110.  And I was

 8        intrigued by the second and third bullet point

 9        on that slide.  The second bullet point says

10        Mylan's premature launch will subvert the intent

11        of the other 10 Colcrys ANDA settlements.

12        Really?  Says who?  They're not in evidence

13        before Your Honor.  It's totally extrinsic.

14        Shouldn't be considered.  And then bullet point

15        3 --

16                    THE COURT:  Well, it would be okay

17        if it were extrinsic, but I think, as you say,

18        there's no actual evidence of what those

19        settlements are.

20                    MR. SOMMER:  Right.  I think you

21        said it better than me, Judge.  And then the

22        third bullet point, this assertion that there

23        would be permanent and non-recoverable loss of

24        market share and price erosion, again, there has
```

```
 1    been no showing of that by Takeda whatsoever in

 2    its papers.  In fairness, they did attach I

 3    think one -- was it Takeda attached one letter

 4    from a customer, an e-mail?  I think there was

 5    one, so there was something, but certainly did

 6    not establish to any extent price erosion and

 7    loss of market share.

 8              THE COURT:  Okay.  Is that all,

 9    Mr. Sommer?

10              MR. SOMMER:  If you could just

11    give me 10 seconds just quickly flip through

12    what else I dragged up here.  Oh, if I may,

13    Judge, I know you already told Mr. Fleming that

14    you weren't going to be persuaded by it, but

15    this, on slide 4, the chronology at the very end

16    where they pointed out that we agreed to a

17    stipulation to avoid a TRO, I just want to tell

18    you two things; one is I guess no good deed goes

19    unpunished, but more importantly, it was an

20    extremely limited agreement.  If you look at our

21    secret code sheet, letter F identifies when that

22    period of time expires.

23              THE COURT:  Yeah, I saw that in

24    the briefing.
```

95

```
 1              MR. SOMMER:  I just didn't want
 2      you to think it was some indeterminant period of
 3      time.
 4              THE COURT:  I appreciate you're
 5      pointing that out and I really do think in this
 6      particular case avoiding a TRO application is I
 7      like to phrase a good deed.  So yeah, whatever I
 8      decide I'm not going to use that against you.
 9              MR. SOMMER:  I think that's all I
10      have, Judge.  Thank you.
11              THE COURT:  Mr. Fleming, briefly.
12              MR. FLEMING:  Very briefly, Your
13      Honor.  I'd like to address quickly the document
14      that was handed up by Mr. Sommers.  I think
15      1.2(d) and 1.2(g) are very different.  1.2(d)
16      does talk about products.  You can't not
17      infringe something that's not a product.  So
18      1.2(d) definitely goes to a product.  And 1.2(g)
19      talks about patents can invalid.  And I think
20      everyone would agree that if the patents are
21      invalid, there is no license for any patent.  So
22      I don't think you have to specify anything with
23      respect to that.  So I think arguing that 1.2(d)
24      is not product related is inaccurate.  I will
```

```
 1    note that when you specifically asked Mr. Sommer
 2    whether there was any reference in the
 3    settlement or license agreement to Mitigare or
 4    to Hikma, there's none.  He didn't point to
 5    anything, Your Honor.  And it's not there.  And
 6    the reason it's not there is because the
 7    parties' intent, which Your Honor is supposed to
 8    consider, and it's part of every contract --
 9              THE COURT:  But I'm supposed to
10    consider based on what's in the agreement,
11    right?  I mean, what the agreement tells me the
12    parties' intent is?
13              MR. FLEMING:  Right.  So
14    everything in the agreement points to Colcrys
15    and Colcrys ANDA products and generics that make
16    Colcrys ANDA products.  That's everything in the
17    agreement and he's gone beyond the agreement.
18    And he accused me of rewriting 1.2(d) but I
19    think he's rewriting it.  And we've looked at
20    those slides.  There was a question about a DJ
21    and what aD J -- well, if a generic made a DJ to
22    Takeda, that wouldn't be a third party case
23    anyway.  That's not a third party decision.
24              THE COURT:  You're saying because
```

```
1     the party brought it against Takeda, Takeda is
2     not a third party, that's what you're saying?
3                     MR. FLEMING:  Right.  Yes.
4                     THE COURT:  I understand Takeda is
5     not a third party, but the generic who brought
6     it, they're a third party.
7                     MR. FLEMING:  Okay.
8                     THE COURT:  Aren't they?
9                     MR. FLEMING:  You're right.  And
10    then one last point, Your Honor.  With respect
11    to the example that Mr. Sommers made about
12    Hikma --
13                    THE COURT:  Let me just get
14    something straight here.  According to what's
15    written down here, I think he's Mr. Sommer.
16                    MR. FLEMING:  I'm sorry.
17                    THE COURT:  Is that right?
18                    MR. SOMMER:  Yes.
19                    MR. FLEMING:  I'm sorry.  Mr.
20    Sommer.  This is the first time I met Mr.
21    Sommer, so I apologize.  So with respect to his
22    assertions that in the Hikma case if Hikma was a
23    generic, which it's not, and whether he went to
24    eight patents and five were dropped or not
```

98

```
1    adjudicated, whether that would permit them to

2    launch or get rid of the 30-month, it definitely

3    would not.  They need a determination.  Hikma

4    would have needed a determination on all eight

5    patents.  The dismissal with prejudice --

6                THE COURT:  And that is to launch

7    before the 30 months is up, right?

8                MR. FLEMING:  Correct.  And be a

9    triggering event.  That was the purpose and a

10   reasonable interpretation of 1.2(d).  That was

11   to address a generic launching within a 30-month

12   period or being available to them.  And that

13   would then trigger and permit Mylan to get

14   either equal footing or an advanced launch date.

15               THE COURT:  Is there any reference

16   in the 40 pages of agreement to the 30 months?

17               MR. FLEMING:  There are multiple

18   references to the Hatch Waxman act, but there's

19   no specific -- the words 30 month are not there.

20               THE COURT:  Okay.

21               MR. FLEMING:  Thank you, You

22   Honor.

23               MR. SOMMER:  Judge, two sentences

24   from the table, if I could.
```

```
 1              THE COURT:  All right.

 2              Mr. Sommer:  Just want to point

 3    out two things.  The Hikma case was not a Hatch

 4    Waxman case, so no 30-month stay.

 5              THE COURT:  Got that.

 6              MR. SOMMER:  And then finally on

 7    that it says nothing about Mitigare in the

 8    contract, it does talk about licensed patents

 9    and Takeda asserted those licensed patents in

10    the Mitigare case.

11              THE COURT:  Okay.  All right.  So

12    thank you.  I did think -- and I'm not going to

13    issue a decision right now, but I do think the

14    argument has sharpened up really the -- that

15    really the issue is, you know, probability of

16    success on the merits and it very much boils

17    down to this 1.2(d) paragraph as informed by the

18    rest of the contract and with the date that

19    you've given the code of F to in mind, if

20    that's -- it's not going to be long before I

21    have a decision and -- and if I have a decision

22    that's favorable to Mylan, does this date code

23    F, is that sort of the first date that Mylan can

24    do anything or its actually -- actually I think
```

```
1     I saw this, it's like my decision or the date,
2     whichever comes first?
3                 MR. SOMMER:  Correct, Your Honor.
4                 THE COURT:  Okay.  All right.  I
5     think it's pretty much the case that if I had a
6     decision that was favorable to Mylan, I would
7     probably stay it for some short period of time,
8     maybe 7 days so that people could run to the
9     federal circuit and give them at least a chance
10    to think whether that's something that they want
11    to give themselves more time to consider or not.
12    Do you have any comment on that, Mr. Sommer?
13                MR. SOMMER:  No.
14                THE COURT:  Okay.  All right.
15    Well, thank you very much.  I've enjoyed the
16    arguments and we'll be in recess.
17                (End at 12:31 p.m.)
18
19
20
21
22
23
24
```

```
 1    State of Delaware )
                        )
 2    New Castle County )

 3

 4

 5                   CERTIFICATE OF REPORTER

 6

 7          I, Stacy M. Ingram, Certified Court Reporter

 8    and Notary Public, do hereby certify that the

 9    foregoing record, Pages 1 to 101 inclusive, is a true

10    and accurate transcript of my stenographic notes

11    taken on January 21, 2020, in the above-captioned

12    matter.

13

14          IN WITNESS WHEREOF, I have hereunto set my

15    hand and seal this 21st day of January 2020, at

16    Wilmington.

17

18

19                      /s/ Stacy M. Ingram__

20                   Stacy M. Ingram, CCR

21

22

23

24
```