IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TAKEDA PHARMACEUTICALS U.S.A., INC.,

    Plaintiff and Counterclaim-Defendant,

v.

MYLAN PHARMACEUTICALS INC.,

    Defendant and Counterclaim-Plaintiff.

Civil Action No. 19-2216-RGA

MEMORANDUM OPINION

Francis DiGiovanni, Thatcher A. Rahmeier, FAEGRE DRINKER BIDDLE & REATH LLP, Wilmington, DE; Alan Richard Silverstein, CONNOLLY GALLAGHER LLP, Wilmington, DE; Camile Y. Turner, Edgar H. Haug, Jonathan Herstoff, Nicholas F. Giove, Porter F. Fleming, HAUG PARTNERS LLP, New York, NY;

    Attorneys for Plaintiff and Counterclaim-Defendant.

Cortlan S. Hitch, Kenneth Laurence Dorsney, MORRIS JAMES LLP, Wilmington, DE; David S. Steuer, WILSON SONSINI GOODRICH AND ROSATI, PC, Palo Alto, CA; Jessica L. Margolis, Sheryl S. Bassin, WILSON SONSINI GOODRICH AND ROSATI, PC, New York, NY; Nicole W. Stafford, WILSON SONSINI GOODRICH AND ROSATI, PC, Austin, TX;

    Attorneys for Defendant and Counterclaim-Plaintiff.

December 3, 2024

**ANDREWS, UNITED STATES DISTRICT JUDGE:**

Before me is Mylan's Motion for Summary Judgment (D.I. 271) and Takeda's cross-motion for the same. (D.I. 274). Both motions concern Mylan's Counterclaims for Takeda's breach of §§ 1.7 and 1.12 of a license agreement ("Agreement") between the two parties regarding Mylan's launch of its generic colchicine product.[1] (D.I. 164). I have considered the parties' briefing. (D.I. 272, 281) (Mylan's briefs); (D.I. 278, 285) (Takeda's briefs). For the reasons set forth below, Mylan's motion is granted in part, and Takeda's cross-motion is granted in part.

## I. BACKGROUND

The parties' current motions come after roughly eight years of litigation. This litigation began when Takeda, which holds seventeen patents for Colcrys, a branded version of the drug colchicine (D.I. 15, Ex. 4), filed a patent infringement suit against Mylan, which had filed an Abbreviated New Drug Application (ANDA) with the Food and Drug Administration (FDA) for a generic colchicine product. *See Takeda Pharmaceuticals U.S.A., Inc. v. Mylan Pharmaceuticals Inc.*, No. 16-cv-987-RGA (D. Del.).

The parties settled and entered into the Agreement, which allowed Mylan to sell its generic colchicine product after, among other possible triggering events, a "Final Court Decision" had held that "all unexpired claims of the Licensed Patents were asserted and adjudicated against a Third Party [and were] either (i) not infringed, or (ii) any combination of not infringed and invalid or unenforceable[.]" (D.I. 218, Ex. 2, § 1.2(d)). In November 2019, believing this condition to have been fulfilled by my granting summary judgment against Takeda in *Takeda Pharms., U.S.A., Inc. v. West-Ward Pharm. Corp.*, 2018 WL 6521922 (D. Del. Dec. 12, 2018), Mylan launched its

---

[1] The First Counterclaim alleges breach of § 1.7 of the License Agreement. (D.I. 164 at 32). The Second Counterclaim alleges breach of § 1.12 of the License Agreement. (*Id.* at 33).

generic colchicine product. (D.I. 2 ¶ 64). Takeda sued for patent infringement and breach of contract in December 2019 (*id.* ¶ 1), and both parties agreed for Mylan to engage in a short-term pause in sales while I expedited the briefing schedule on Takeda's motion for preliminary injunction. (D.I. 8).

In *Takeda Pharms. U.S.A., Inc. v. Mylan Pharms., Inc.*, 2020 WL 419488, at *3 (D. Del. Jan. 27, 2020), *aff'd*, 967 F.3d 1339 (Fed. Cir. 2020), I denied Takeda's motion for a preliminary injunction. Takeda appealed to the Federal Circuit, which granted Takeda's request for a temporary injunction "pending the court's consideration of Takeda's request for an injunction pending appeal." *Takeda Pharms. U.S.A., Inc. v. Mylan Pharms. Inc.*, No. 20-1407 (Fed. Cir. Jan. 28, 2020), D.I. 14 at 2. In March of 2020, the Federal Circuit denied Takeda's request for an injunction pending appeal and lifted its temporary order enjoining Mylan from selling its generic colchicine product. *See id.*, D.I. 60 at 2. In *Takeda Pharms. U.S.A, Inc. v. Mylan Pharms., Inc.*, 2023 WL 6295453, at *8 (D. Del. Sept. 27, 2023), I granted summary judgment in favor of Mylan on Takeda's breach of contract claim, which necessarily resolved Takeda's claim for patent infringement in Mylan's favor.

Mylan now counterclaims for damages, arguing that Takeda's December 2019 suit breaches §§ 1.7 and 1.12 of the Agreement. (D.I. 164). Section 1.7, titled "Covenant Not to Sue," provides, in relevant part:

> Takeda covenants (provided there is no material breach by Mylan) . . . not to sue, assert any claim or counterclaim against, or otherwise participate in any action or proceeding against Mylan or any of its Affiliates . . . for infringement of any U.S. or foreign patent or patent application owned, licensed or otherwise controlled, now or in the future, by Plaintiff or any of its respective Affiliates at any time during the term of this Agreement based on or arising from the manufacture, use, sale, offer for sale or importation within the scope of the License, of [Mylan's generic colchicine product][.]

(D.I. 218, Ex. 2, § 1.7). Section 1.12, titled "No Interference," provides, in relevant part:

3

> Takeda represents and warrants that, as of the Effective Date, Takeda shall not . . . initiate or otherwise undertake any activity against the Mylan ANDA or Mylan ANDA Product for the purpose of: (i) interfering with . . . Mylan's efforts to market, manufacture, use, sell, offer to sell, import or distribute the Mylan ANDA Product as of and after the Generic Entry Date in accordance with the terms of this Agreement . . ., or (ii) interfering with Mylan's efforts to market the Mylan ANDA Product as of and after the Generic Entry Date in accordance with the terms of this Agreement[.]

(D.I. 218, Ex. 2, § 1.12). Mylan seeks damages for the period for which Takeda's litigation kept it off the market, in addition to attorney's fees. (D.I. 164 at "Prayer for Relief").

## II. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). Material facts are those "that could affect the outcome" of the proceeding. *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "[A] dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Id.* The burden on the moving party may be discharged by pointing out to the district court that there is an absence of evidence supporting the non-moving party's case. *Celotex*, 477 U.S. at 323.

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Williams v. Borough of West Chester*, 891 F.2d 458, 460–61 (3d Cir. 1989). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ..., admissions, interrogatory answers, or other

materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence ... of a genuine dispute ...." Fed. R. Civ. P. 56(c)(1). The non-moving party's evidence "must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Williams*, 891 F.2d at 460–61.

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex*, 477 U.S. at 322.

### III.   DISCUSSION

There is no genuine dispute of material fact, making this an appropriate case for summary judgment. Fed. R. Civ. P. 56(c).

A. Takeda's Patent Infringement Suit Breached § 1.7 of the Agreement

For the following reasons, I find that Takeda's patent infringement suit breached § 1.7's covenant not to sue.

1. State, Not Federal, Law Applies

The parties disagree whether federal or state law applies when interpreting a covenant not to sue in a patent licensing agreement. (D.I. 278 at 7) ("The proper construction of a covenant not to sue for patent infringement implicates federal law."); (D.I. 281 at 1) ("Delaware law – not federal law – governs the interpretation of the License Agreement."). I find that Delaware law applies.

The License Agreement provides for the application of Delaware law. (D.I. 218, Ex. 2, § 5). Usually, this would be dispositive.

The Federal Circuit has recognized an exception to the application of state law to contract interpretation when the contract claim requires resolution of a related question of patent law. *See Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1364 (Fed. Cir. 2010). This is not such a case, however. *See Lab'y Corp. of Am. Holdings v. Metabolite Lab'ys, Inc.* 599 F.3d 1277, 1284 (Fed. Cir. 2010) (collecting contrasting examples in which federal law would be implicated). Takeda cites *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 501 (1964), but to little effect. The *Aro* court was concerned with the applicability of 35 U.S.C. § 271(c) against one infringer in light of an old common law rule that extended releases for one joint-tortfeasor to other joint-tortfeasors. *See id.* The Court was not concerned with patent claim releases generally, but with the scope of the federal law governing patent infringement. That question clearly implicates patent law. Takeda pushes too far by attempting to apply *Aro* to this case, and suggests no question of patent law elsewhere that is implicated by this case.

This clean separation between patent law and contract interpretation is evident in my previous decision to bifurcate the breach of contract claim from the rest of the claims in the case (D.I. 198), which would have made little sense had I considered venturing into patent law necessary to decide the breach of contract claim. Because traditional tools of contract interpretation are sufficient to decide the case, and do not involve any issues of patent law, I find that Delaware law applies.

### 2. The Plain Language of the Contract Supports Mylan's Interpretation

In Delaware, "the proper interpretation of [contract] language is a question of law." *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006). "[B]ecause

Delaware adheres to an objective theory of contracts, the contract's construction should be that which would be understood by an objective, reasonable third party." *Exelon Generation Acquisitions, LLC v. Deere & Co.*, 176 A.3d 1262, 1267 (Del. 2017). Each term and provision should be given effect, "so as not to render any part of the contract mere surplusage," and the interpretation should not render a term or provision "meaningless or illusory." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (citation omitted). "When the contract is clear and unambiguous, we will give effect to the plain-meaning of the contract's terms and provisions. On the contrary, when we may reasonably ascribe multiple and different interpretations to a contract, we will find that the contract is ambiguous." *Id.* at 1159-60. "The determination of ambiguity lies within the sole province of the court." *Id.* at 1160.

Mylan's interpretation of the contract is simple: Section 1.7 forbids Takeda from suing for patent infringement in the absence of a material breach. (D.I. 218 at 1). I found that there was no material breach. (D.I. 244 at 15). Therefore, § 1.7 forbade Takeda's patent infringement suit.

Takeda responds by arguing that § 1.7 includes an implicit "good faith" requirement, shielding Takeda from liability for breach when it brings suit under a reasonable belief that a material breach has occurred. (D.I. 278 at 2). In support of this argument, Takeda points to *Artvale v. Rugby Fabrics Corp.*, 363 F.2d 1002, 1008 (2d Cir. 1966), a Second Circuit decision holding that covenants not to sue impose liability "only for suits brought in obvious breach or otherwise in bad faith." Takeda also points to other provisions in the Agreement that clearly contemplate the possibility of litigation (D.I. 278 at 12–14), including § 1.10, which provides, "Takeda shall be entitled to specific enforcement of the terms and conditions set forth in Paragraphs 1.2 and 1.4" of the Agreement. (D.I. 218, Ex. 2, § 1.10).

7

I find Mylan's argument more persuasive. Absent language pointing to a good faith requirement, the contract is clear and unambiguous. Takeda's arguments to the contrary are unconvincing.

First, it is doubtful that Delaware would follow the *Artvale* standard. This seems to be a question of first impression, *see Appel v. Kaufman*, No. CV 08-392, 2011 WL 13377541, at *2 (E.D. Pa. Jan. 5, 2011) (noting the same for the Third Circuit and Pennsylvania courts), so neither party's cases are entirely on point, but the weight of the authority supports Mylan's argument. In *Edge of the Woods v. Wilmington Sav. Fund Soc'y, FSB*, No. 97C-09-281, 2001 WL 946521, at *7 (Del. Super. Ct. Aug. 16, 2001), for example, the Delaware Superior Court granted summary judgment on a counterclaim for breach of contract where a plaintiff sued in violation of contractual promises not to do so. Takeda attempts to distinguish *Edge of the Woods* by arguing, "Takeda did not provide multiple covenants not to sue nor releases to Mylan in exchange for repeated benefits" (D.I. 278 at 19), but fails to explain why multiple releases or repeated benefits would be governed by a different principle than a single covenant. In both cases, "Defendant bargained for and relied on Plaintiffs' promises not to sue." *Edge of the Woods*, 2001 WL 946521 at *7. In *LPPAS Representative, LLC v. ATH Holding Co.*, 2022 WL 94610, at *7 (Del. Ch. Jan. 10, 2022), the Court of Chancery rejected the argument that "advancing a reasonable position as to an ambiguous contract is not a breach," holding instead that "faith, good or bad, is irrelevant to whether [the alleged breaching party] violated a contractual obligation." *Id.* Takeda again attempts to distinguish—this time by arguing that the agreement in *LPPAS Representative* included explicit fee-shifting language (D.I. 278 at 19)—but the question of availability of damages is distinct from the question of whether a breach has occurred in the first place. Takeda's response addresses the

8

former, but not the latter, and especially in light of *LPPAS Representative*'s unambiguous language, falls short.

Second, Takeda argues that other provisions in the contract should color my interpretation of the covenant not to sue. Specifically, Takeda notes that provisions like § 1.10, which provides, "Takeda shall be entitled to specific enforcement of the terms and conditions set forth in Paragraphs 1.2 and 1.4" of the Agreement (D.I. 218, Ex. 2, § 1.10), explicitly contemplate the possibility that Takeda will bring suit: "The parties could not have intended for Takeda to be liable for good-faith conduct that is expressly authorized under Section 1.10." (D.I. 278 at 18). Takeda is correct that I must read the contract "as a whole," *Osborn*, 991 A.2d at 1159 (citation omitted), but provisions contemplating litigation are not inconsistent with a requirement that litigation only be brought in the event of a material breach. Even more so, if the litigation contemplated is contract litigation but the material breach requirement only applies to patent litigation.

When I read the Agreement as a whole, I note the narrow scope of § 1.7 of the Agreement. It does not limit litigation generally. It limits only "case[s] for [patent infringement]." (D.I. 218, Ex. 2, § 1.7). Takeda could have brought a breach of contract claim or otherwise sought to enforce the Agreement without even arguably breaching § 1.7 of the Agreement. If a lawsuit for breach of contract resulted in a determination that Mylan had breached the contract, Takeda would have been able to sue for patent infringement without any risk that it could be sued for breach of contract. I think this makes sense. Patent litigation is notoriously time-consuming and expensive. Contract litigation, not so much.

Thus, I find the Agreement's covenant not to sue for patent infringement absent a material breach by Mylan to be clear and unambiguous. Since Mylan did not breach, Takeda breached when it sued Mylan for patent infringement.

9

B. Takeda Did Not Breach § 1.12 of the Agreement

Delaware law leads me to the opposite conclusion when it comes to § 1.12, the Agreement's "no interference" provision. I find that Takeda did not breach this provision.

First, the plain language of § 1.12 compels me to agree with Takeda. Section 1.12 is the Takeda representation it will not

> undertake any activity against the Mylan ANDA or Mylan ANDA Product for the purpose of: (i) interfering with Mylan's efforts to obtain and maintain FDA approval of the Mylan ANDA or the Mylan ANDA Product, or Mylan's efforts to market, manufacture, use, sell, offer to sell, import or distribute the Mylan ANDA Product as of and after the Generic Entry Date in accordance with the terms of this Agreement, including, but not limited to, the filing of a lawsuit against FDA or the filing or submission of any Citizen Petitions, correspondence or other written submissions with FDA or any regulatory or governmental authority related to the Mylan ANDA Product, or (ii) interfering with Mylan's efforts to market the Mylan ANDA Product as of and after the Generic Entry Date in accordance with the terms of this Agreement; <u>provided however</u>, that nothing in this Paragraph 1.12 shall be construed to limit Takeda's ability to communicate with FDA or any other regulatory or governmental authority regarding health, safety, or efficacy matters, or pursuant to court order, or as otherwise requested by the FDA or required by law or order of a court or administrative agency.

(D.I. 218, Ex. 2, § 1.12). The crux of the parties' dispute is whether § 1.12 prohibits activity against the Mylan ANDA or Mylan ANDA Product that is undertaken for the purpose of "interfering" reaches lawsuits against Mylan.

Start with subsection (i). The principle of *noscitur a sociis* is helpful. Under that principle, "a word in a contract is to be read in light of the words around it." *ArchKey Intermediate Holdings Inc. v. Mona*, 302 A.3d 975, 1001 (Del. Ch. 2023). Literally, "it is known by its associates." *Noscitur a sociis*, Black's Law Dictionary (12th ed. 2024). Here, subsection (i) provides that "interfering" activity includes, but is not limited to, "the filing of a lawsuit against FDA or the filing or submission of any Citizen Petitions, correspondence or other written submissions with

10

FDA or any regulatory or governmental authority related to the Mylan ANDA Product."[2] (D.I. 218, Ex. 2, § 1.12(i)). Each of these examples hews closely to Takeda's interpretation: they are activities undertaken with third parties. Under *noscitur a sociis*, then, the prohibited activity is likely limited to similar circumstances. The common thread in the "associates" is that they are third party regulatory agencies. The final statement in § 1.12—"[N]othing in this Paragraph 1.12 shall be construed to limit Takeda's ability to communicate with FDA or any other regulatory or governmental authority regarding health, safety, or efficacy matters" (*id.* at § 1.12)—further suggests that § 1.12 is aimed at activity with regulatory third parties by outlining acceptable exceptions to the general rule against activity with such parties. Finally, I note that the phrase "undertake any activity against the Mylan ANDA or Mylan ANDA Product" (*id.*) would be particularly strange if the parties intended the provision to cover lawsuits against Mylan. In that case, the parties could have simply written "Mylan" in that phrase. Thus, I conclude that Takeda's "representation and warranty" is directed not at "activity" the purpose of which is to "interfere" with Mylan's efforts directly, but "activity" the purpose of which is to interfere with Mylan's efforts through interactions with third parties such as the FDA and other regulatory agencies by litigation, Citizen Petitions, correspondence or the like.

Subsection (ii) presents a more difficult case. The conduct that the language of subsection (ii) covers—"interfering with Mylan's efforts to market the Mylan ANDA Product as of and after the Generic Entry Date in accordance with the terms of this Agreement" (*id.*)—is already covered verbatim by subsection (i), which includes "efforts to market" in the list of conduct protected from the interfering activity. (*Id.*). The only other distinction from subsection (i) is that subsection (ii)

---

[2] "Citizen Petitions" refer to a particular practice before the FDA. I have had a number of cases where one pharmaceutical company files a Citizen Petition about its competitor's product. The Citizen Petition can lead to delay in the competitor being able to launch its product.

11

is not subject to the "including, but not limited to. . ." language. All this considered, it is not clear what the purpose of subsection (ii) is. The parties have not adequately briefed the issue either. In nearly eighty pages of briefs, the only mention of subsection (ii), as distinct from subsection (i), comes in a single sentence in Mylan's reply brief, which hardly does more than quote the subsection. (*See* D.I. 281 at 10).

Because subsection (ii) pertains to conduct already explicitly covered by subsection (i), and because neither party has provided briefing on what subsection (ii) might cover that subsection (i) does not, I decline to speculate unnecessarily as to subsection (ii)'s meaning. For the purposes of resolving the parties' motions, it is sufficient that I determine whether it covers lawsuits against Mylan. I conclude that it does not. The provision's statement that "nothing in this Paragraph 1.12 shall be construed to limit Takeda's ability to communicate with FDA or any other regulatory or governmental authority regarding health, safety, or efficacy matters" applies equally to both subsections of § 1.12, and in both subsections suggests that it is articulating an exception to the conduct that each section typically covers: activity with third parties intended to interfere with the ANDA or ANDA product. The section's references to "the Mylan ANDA or Mylan ANDA Product" apply to both subsections. As with subsection (i), that is strange language to use if the subsection covers lawsuits against Mylan itself.

Beyond plain language, Mylan's interpretation of § 1.12(i) and (ii) is at odds with the rest of the Agreement. Specifically, Mylan's interpretation threatens to swallow § 1.7. If lawsuits fall under "interference" as that term is used in § 1.12, then it is difficult to imagine the role that § 1.7 plays in the Agreement. Indeed, the specificity with which § 1.7 is written—barring only patent infringement claims, and only in the absence of a material breach—is completely unnecessary if § 1.12 is read to bar all lawsuits that affect Mylan's efforts to manufacture and market their generic

colchicine product. Especially in view of other provisions that explicitly consider Takeda's ability to bring suit (*see, e.g.*, D.I. 218, Ex. 2, §1.10), Mylan's view seems highly unlikely. Because Delaware law counsels against "render[ing] any part of the contract mere surplusage," *Osborn*, 991 A.2d at 1159, I am persuaded that § 1.12 does not extend to lawsuits against Mylan. Even if it could be read that way, Mylan concedes that in that case "principles of contract construction dictate that the more specific provision controls." (D.I. 281 at 10) (citing *Katell v. Morgan Stanley Grp., Inc.*, 1993 WL 205033, at *4 (Del. Ch. June 8, 1993)). Here, the more specific provision is the one that explicitly discusses lawsuits against Mylan: Section 1.7.

Mylan argues that if § 1.12 is read *not* to cover lawsuits against Mylan, then Takeda's other conduct still fits the bill: "Takeda ignores the host of interfering activity it engaged in beyond merely filing this lawsuit, including its pre-suit demands and repeated requests for injunctive relief, all of which violated Section 1.12." (D.I. 281 at 10). Requesting injunctive relief is undeniably part of a lawsuit. Since filing a lawsuit against Mylan is not prohibited, the individual parts of a lawsuit are not prohibited. Pre-suit demands, while closely connected to the lawsuit, are not prohibited by the covenant not to sue.[3] Nevertheless, given that they are not directed at a third party, they are not prohibited by the no interference covenant. On the facts before me, Takeda has not engaged in any conduct that satisfies § 1.12.

### C. Mylan Is Entitled to Damages Including Attorney's Fees in Defense of the Patent Infringement Claims

Because I determine that Takeda breached § 1.7 of the Agreement, Mylan is entitled to damages. Those damages, at a minimum, include attorney's fees in defense of the claims of patent infringement. Takeda suggests that the American Rule, which provides that litigants must bear

---

[3] I doubt that pre-suit demands, even if considered to be a breach, by themselves caused any damages. Certainly, Mylan says it was the litigation that caused its damages. (D.I. 272 at 12).

13

their own litigation costs, absent certain conditions, *see In re Delaware Pub. Sch. Litig.*, 2024 WL 332738, at *7 (Del. Jan. 30, 2024), precludes such damages. (D.I. 278 at 15–17). *Delaware Pub. Sch. Litig.* is not a contract case. Per *White Winston Select Asset Funds, LLC v. Good Times Restaurants, Inc.*, 2024 WL 2745174, at *3 (3d Cir. Mar. 1, 2024), however, Mylan "seeks attorneys' fees as damages for breach of contract—not as costs of litigation from a non-prevailing party. Therefore, any damages award would not implicate the American Rule or its exceptions applicable in Delaware." *White Winston* is not precedential, but I think it correctly states Delaware law, and it is right on point.

D. I Decline to Certify the Question of Liability to the Delaware Supreme Court

Takeda argues in the alternative that I should certify the question of its liability to the Delaware Supreme Court. I decline to do so. *United States v. Defreitas*, 29 F.4th 135 (3d Cir. 2022), provides the relevant legal standard, holding that a federal court should only certify after considering the following three factors: (1) whether the question's resolution is "unclear and control[ling] in the case," (2) the "importance" of the question, and (3) principles of judicial economy. *Id.* at 141–42. I consider each factor in turn.

First, while the presence or absence of a "good faith" exception to liability for breach of a covenant not to sue controls this case, the resolution is not so unclear that I "cannot predict how [the Delaware Supreme Court] would rule." *Id.* at 141. I am not clairvoyant, but considering *Edge of the Woods*, 2001 WL 946521, at *7, *LPPAS Representative*, 2022 WL 94610, at *7, and the Third Circuit's interpretation of Delaware law in *White Winston*, 2024 WL 2745174, at *3, I believe I have a sufficient basis on which to predict how the Delaware Supreme Court is likely to rule on this issue.

14

Second, the question of liability for breach of a covenant not to sue is likely not so important as to warrant certification. It is not an open question of state constitutional law, *Defreitas*, 29 F.4th at 142, nor do I believe that resolving this issue for or against Takeda would result in significant forum shopping in the future, *id.* While this issue may implicate some state public policy concerns, *id.*, it can also be avoided entirely through artful contract drafting.

Third, judicial economy could factor for or against certification. While Takeda is correct that going through fact and expert discovery on damages for an uncognizable claim would be wasteful[4] (D.I. 278 at 24), certifying to the Delaware Supreme Court risks further delay in an already protracted legal dispute. On balance, the *Defreitas* factors weigh against certification.

## IV. CONCLUSION

For the reasons set forth above, Mylan's Motion for Summary Judgment (D.I. 271) is granted in part. Mylan is granted summary judgment on its First Counterclaim. It is denied summary judgment on its Second Counterclaim. Takeda's Cross-Motion for Summary Judgment (D.I. 274) is granted in part. Takeda is denied summary judgment on Mylan's First Counterclaim. Takeda is granted summary judgment on Mylan's Second Counterclaim.

An appropriate order will issue.

---

[4] I note that fact and expert discovery is nearly complete. The last expert report is due to be served in less than a week. (D.I. 364).